Commonwealth *v.* VanBuskirk et al., Appellants.

614

Argued April 24, 1944. Before KELLER, P. J., BALD-
RIGE, HIRT, and KENWORTHEY, JJ. (RHODES, RENO and
JAMES, JJ., absent).

616

*Harry M. Berkowitz* and *George H. Detweiler*, for appellants.

*Franklin E. Barr*, Assistant District Attorney, with him *John H. Maurer*, District Attorney, for appellee.

OPINION BY KELLER, P. J., September 27, 1944:

The defendants, VanBuskirk and Barfod, were tried together on two joint bills of indictment to April Sessions 1941, Philadelphia County. The one (No. 329) charged them, as officers of a certain corporation, to wit, Coal Operators Casualty Company, (a casualty insurance company), with embezzlement and fraudulent conversion, in eight counts, under different applicable sections of The Penal Code, but all covering the same transaction, and therefore subjecting each of them to but one sentence. The other (No. 330) charged them with conspiracy to defraud Coal Operators Casualty Company for the benefit of themselves and of the United States Plate Glass and Liability Insurance Company of Philadelphia, a corporation of which they were officers and the record owners. The court withdrew from the jury the fifth and sixth counts of No. 329, charging fraudulent conversion by the defendants, acting with certain associates, but left the other six counts of No. 329, and No. 330 to the jury, which rendered general verdicts of guilty on both indictments. The defendants were sentenced on No. 329 only, and took these separate appeals from their respective sentences.

The six counts of indictment No. 329 may be grouped under three sections of The Penal Code, viz.: Nos. 1 and 2 charged embezzlement by them as *officers of a corporation,* in violation of section 827; Nos. 3 and 4 charged embezzlement by them as officers of a *casualty insurance company,* in violation of section 828—see also Act of May 17, 1921, P. L. 682, sec. 345; and Nos. 7 and 8 charged them with fraudulent conversion of certain property belonging to the said Coal Operators Casualty Company. Nos. 1, 3 and 7 charged that the defendants had appropriated *to their own use* the property so embezzled or fraudulently converted by them; while Nos. 2, 4 and 8 charged that the property so embezzled or fraudulently converted by them had been appropriated, applied or converted *to the use of the United States Plate Glass and Liability Insurance Company* aforesaid.

The subject matter charged as having been embezzled or fraudulently converted by the defendants consisted of United State Treasury bonds of various issues and denominations, of the par value of $274,800, and Federal Land Bank bonds of the par value of $25,000, all the property of Coal Operators Casualty Company, and having a market value in excess of $325,000. For convenience we shall call them U. S. bonds of the par value of $299,800, as they were referred to on the trial.

The evidence on the trial revealed the following facts:

In June, 1938, the defendants became the owners of all the stock of a plate glass insurance corporation, chartered in this State in 1867, known as United States Plate Glass Insurance Company of Philadelphia. See Acts of April 12, 1867, P. L. 1165, and April 4, 1868, P. L. 1869, p. 1352. Its capital stock when they obtained control consisted of 1000 shares of a par value of $100 a share. By appropriate action, it seems, they changed the name of the corporation to United States Plate Glass and Liability Insurance Company, but did

not change or enlarge its corporate purpose and authority, to wit, 'effecting insurance upon plate glass of all kinds and description'. It had no authority to do business anywhere but in the State of Pennsylvania. They also changed the capitalization to 20,000 shares of a par value of $5 a share, and deposited 19,000 shares of the stock with J. W. Sparks & Co. of Philadelphia, as security for a loan or loans to the company or themselves—the *books* do not show which.

VanBuskirk was the president of the corporation and Barfod, the secretary and treasurer. They owned all the stock between them equally; assigning a few shares to others who acted as directors, with and for them.

The report of the company—which we shall call U. S. Plate Glass—for the year 1939 filed with the Insurance Commissioner of the Commonwealth showed net premium receipts of $21,340.06, losses incurred of $10,-616.95, and underwriting expenses of $53,623.47, or a net loss for the year on its insurance writing of $42,-900.36. The net *premium receipts* for 1940 were $15,-052.77, and losses paid $10,379.08. The annual statement for 1940, printed in the record, Commonwealth's Exhibit No. 19, pp. 605a-608a, does not show the *assets* of the company nor its *underwriting expenses* and *net loss* for that year.

On August 1, 1940 the company's books showed cash on hand, or in bank, of $182.62. It owned United States Government bonds of the value of $521.09. Premium receipts of $2,466.70 were due it. Its only other tangible assets were mortgage bonds of the Roseld Avenue Deal Corporation of a par value of $175,000, out of an issue of $375,000, covering an apartment house in Deal, N. J., and a piece of real estate at 1424 Walnut Street, Philadelphia, which was carried on the company's books at a valuation of $157,519.54, and was subject to a mortgage of $170,000. In addition VanBuskirk had made certain commitments for the purchase of all

the shares of two 'investment' corporations, viz., Trusteed Industries Shares Management Corporation and Transcontinent Shares Corporation, for the sum of $215,000 of which $92,500, was said to have been paid down, which called for the payment of $11,000 every three months until the whole was paid, of which approximately $75,000 was unpaid on August 1, 1940. The interest of VanBuskirk or U. S. Plate Glass in these shares, subject to a prior assignment to the sellers, was transferred to J. W. Sparks & Co., as security for a loan of about $143,000, of which no record appeared on the books of U. S. Plate Glass.

The income from the insurance business of the company was insufficient to meet the underwriting expenses, let alone the commitments made by VanBuskirk as above mentioned, the taxes on the Philadelphia real estate, the interest on the mortgage, etc.

As a consequence it owed taxes on its real estate of $6,512.18, exclusive of penalties; rent on its Philadelphia office for six months at $75 per month; rent on its New York office, (although it had no authority to do business there), occupied by VanBuskirk, for five or six months at $300 per month; Hotel Essex, Philadelphia, for rooms, meals, etc. at least $1,200. And its available cash and U. S. bonds were less than $1,000.

Accordingly, in the early part of August, 1940, and perhaps earlier, the defendants looked around to see if they could find some prosperous casualty insurance company which they could purchase with the idea of effecting a merger with U. S. Plate Glass, and their attention fell on Coal Operators Casualty Company, of Greensburg, Pa., a company engaged in writing workmen's compensation insurance. Coal Operators—as we shall call it—had assets as of June 30, 1940 of $1,319,-481.55, of which $213,826.01 was cash; $411,146.60, U. S. bonds; $372,544.09, state and municipal bonds; $114,-120.20, railroad bonds; $77,172.50, public utility bonds;

$8,469.50, Argentine Republic bonds; and $11,967.15, industrial and miscellaneous bonds; $100,397.42 was premiums receivable, not over ninety days due; $7,-717.42, accrued interest, and $5,399.92, miscellaneous assets. The liabilities consisted of Reserve for losses, $936,524.93, Reserve for loss adjustment expenses, $28,-095.74, Reserve for unearned premiums $136,332.46, Commission and brokerage payable, $13,039.31, Accrued taxes, $7,900, Miscellaneous accounts payable $2,000, Reserve for Bureau assessments and Stock Workmen's Compensation Security Fund, $19,400; leaving capital of $100,000 and surplus of $76,189.11. The capital was divided into 1000 shares of a par value of $100 each, of which John A. Robertshaw, the president, owned 700.

VanBuskirk got into communication with Robertshaw and after some negotiations, on August 20, 1940, obtained from him an option, expiring August 27, 1940 at five o'clock P. M., to buy his 700 shares of stock of Coal Operators at $500 a share upon the terms and conditions, *inter alia,* following, to wit, $50,000 cash on the signing of the *agreement of sale,* and the balance of $300,000 to be paid in fifteen yearly instalments of $20,000 each, payable on the first day of March of each year, beginning 1941, with interest on the unpaid balance at 1½ per cent per annum. As security for the payment of said instalments VanBuskirk agreed to deposit with the Barclay-Westmoreland Trust Company, as depositary, all of the said 700 shares, and also agreed to *withdraw* all of said shares from said depositary *on January 15, 1941,* and *substitute therefor* bonds issued by or guaranteed as to principal and interest by the United States of America, having a total market value of not less than $367,125, and to maintain the same so as always to have on deposit 110% of said security for the unpaid balance until paid.

Robertshaw separately agreed to get in touch with the other stockholders and endeavor to secure their stock for VanBuskirk, which he did, at prices ranging from $300 to $500 a share, amounting in all to $106,600. He told all of them of the terms of his own agreement to sell his shares to VanBuskirk.

On August 26, 1940, the transaction was consummated by VanBuskirk by the delivery to the owners of Coal Operators stock of cashier's checks of the First National Bank of Greensburg for the amount payable to each of them for the sale of their stock—Robertshaw, $50,000, as per the agreement of sale which was signed that day, and the other stockholders in full payment of their stock, the total amount of said cashier's checks being $156,600. Robertshaw's 700 shares were delivered to Barclay-Westmoreland Trust Company as depositary under said agreement and the other 300 shares were delivered to VanBuskirk.

Two meetings were held that afternoon. The first at one o'clock when the old directors of Coal Operators resigned one by one, and elected directors named by VanBuskirk—who were the same as the directors of U. S. Plate Glass; and the second at two o'clock when the new board organized by electing VanBuskirk, president of the company, W. John Stiteler, Jr.—who had been vice president and general manager under the old board—vice president, Barfod, secretary and treasurer, and D. Ellwood Miller, who had been treasurer under the old board, assistant treasurer. Stiteler and Miller were not directors.

The new board authorized the change of the company's bank account from Barclay-Westmoreland Trust Company to First National Bank of Greensburg and pursuant thereto, Robertshaw and Miller as president and treasurer, respectively, on August 26, 1940 drew a check to the order of First National Bank of Greensburg for $170,000 against Coal Operators' balance in

Barclay-Westmoreland Trust Company, which was used to open a new account in the name of Coal Operators Casualty Company in First National Bank of Greensburg on August 27, 1940; and the same day Coal Operators, by VanBuskirk, President, and Barfod, Treasurer, drew a check on First National Bank for the entire amount, $170,000, in favor of United States Plate Glass and Liability Insurance Company, which was deposited to the credit of the drawee in said bank; and a check was drawn by VanBuskirk and Barfod, as President and Treasurer respectively of U. S. Plate Glass in favor of First National Bank of Greensburg for $156,600 to cover the cashier's checks delivered in payment of said stock, leaving a balance of $13,400 to credit of U. S. Plate Glass in First National Bank and nothing to the credit of Coal Operators.

While the entries of the new accounts in First National Bank in favor of Coal Operators and U. S. Plate Glass, respectively, appeared on the books as of August 27, the transactions actually occurred after banking hours on August 26.

No other money was deposited by defendants or the company to the credit of U. S. Plate Glass; so the result was that VanBuskirk and Barfod acting for U. S. Plate Glass, paid for the stock of Coal Operators purchased from the former owners, as above set forth, by using the cash of the Coal Operators Casualty Company.

The new board of directors of Coal Operators also authorized VanBuskirk and Barfod to direct First National Bank as their agent and depositary to secure from Barclay-Westmoreland Trust Company, the former depositary, all the bonds and securities belonging to Coal Operators in its custody, and transmit them to The Pennsylvania Company for Insurances, etc., at Philadelphia, which would act as the new depositary of its securities, with directions to place them in a

safe deposit box rented to Coal Operators, to which VanBuskirk and Barfod as officers of that company were to have access. This was done, and a few days later Barfod appeared at the Girard Trust Company, Philadelphia, where U. S. Plate Glass had an account showing a balance of $57.22, and made arrangements to borrow $250,000 for U. S. Plate Glass.

He furnished to Mr. Jones, Vice President and Treasurer of Girard Trust Company, a paper dated August 30, 1940, signed by him as secretary and attested under the seal of the corporation, certifying that at a meeting of the Board of Directors of the United States Plate Glass and Liability Insurance Company of Philadelphia held that day at Philadelphia the following resolution was passed:

"Resolved that the President and Treasurer are hereby authorized to borrow on behalf of this Corporation the sum of Two Hundred and Fifty Thousand Dollars, ($250,000), for such times and upon such terms as may to them seem advisable, and to execute notes in the name of this Corporation for any sum so borrowed, and, that the President and Treasurer are hereby empowered to pledge as collateral security any of the stocks, bonds or any of the other securities belonging to this United States Plate Glass and Liability Insurance Company."

He presented a demand collateral note, dated August 30, 1940, filled out on the printed form of the Girard Trust Company, signed in the name and on behalf of United States Plate Glass and Liability Insurance Company by H. E. VanBuskirk, Pres. and Einar Barfod, Treas. (address 131 S. Fourth St., Philadelphia, Pa. [Bullitt Building] with the seal of the company affixed, promising to pay on demand to the order of The Girard Trust Company Two hundred and fifty thousand Dollars, and reciting the delivery therewith of two hundred and seventy-four thousand eight hundred

dollars, par value, of United States Treasury coupon bonds, and Twenty-five thousand dollars, par value, of Federal Land Bank coupon bonds, itemizing their denominations and maturity, as collateral security for the payment of the note and any and all other obligations or liabilities of the maker to Girard Trust Company.

On the receipt of this note and of the bonds therein recited as having been delivered with it, Girard Trust Company lent the maker, U. S. Plate Glass, two hundred and fifty thousand dollars by placing on its books that amount to the credit of the maker of the note. The transaction was completed on August 31, 1940.

The minute book of U. S. Plate Glass fails to show any meeting of the Board of Directors of that company between August 26, 1940 and December 6, 1940, or the presentation or adoption of any resolution as of date of August 30, or any other date, authorizing the action certified to by Barfod as secretary, or authorizing the borrowing of the sum of $250,000 by the president and treasurer of the corporation and the pledging as collateral security of any of its stocks and bonds.

Counsel for defendants argue that the delivery of the certificate proved the holding of the meeting and the adoption of the resolution as certified.

The certificate would, perhaps, be sufficient to protect the Girard Trust Company in making the loan—as tending to show that it acted in good faith—but on the present issue it proves nothing except that Barfod signed and attested the certificate. It does not prove its truth.

In any event, the resolution, if adopted, did no more than authorize the president and secretary to borrow the money and execute notes in the name of the corporation for the money so borrowed and to pledge as collateral security "any of the stocks, bonds or any of the other securities *belonging to this United States*

*Plate Glass and Liability Insurance Company"*; and, it so happened, that that company had no United States bonds or other such securities that were unpledged, and that these bonds to the amount of $299,800 par value, were bonds belonging to Coal Operators Casualty Company, and were part of the securities deposited by that company with The Pennsylvania Company for Insurances, etc., for safe keeping, and that VanBuskirk and Barfod had gone to the depositary as officers of the Coal Operators Casualty Company, authorized to have access to its securities, and had taken out the $299,800 of United States bonds and used them as collateral security to accompany a note of U. S. Plate Glass for $250,000, given to the Girard Trust Company for the use and benefit of U. S. Plate Glass, which had no whit of title to, or ownership in, any of them.

It is not necessary to set forth in the body of this opinion how the money thus illegally secured by these defendants by the unauthorized pledge of bonds of Coal Operators Casualty Company for a debt or obligation not its own, was disbursed by their drawing checks against said account signed by them as president and treasurer, respectively, of U. S. Plate Glass.

A list of the principal disbursements is contained in a supplement or addendum to this opinion, forming a part of it, but not intended for inclusion in the Reports.

It suffices to say, that by the end of October, 1940, all of it had been checked out except $8,634.15. The checks drawn in November reduced the balance to not more than $1,979.85, perhaps less; and the account was closed not long thereafter.

The evidence shows that deducting $170,000, which was used to replace a like amount of funds of Coal Operators which the defendants had illegally converted to the account of U. S. Plate Glass, and out of which they had paid $156,600 for stock of Coal Operators, every dollar of the balance, $80,000, was paid out by

these defendants to themselves, or for the use and benefit of U. S. Plate Glass, or for stock purchases or payments made by them or by VanBuskirk for their benefit or the benefit of U. S. Plate Glass, and not a penny of it was paid to or expended for the benefit of Coal Operators. The district attorney states that Barfod got $11,375.11 and VanBuskirk $37,340.31. Our calculation shows that Barfod received $8,380.36 out of the Girard Trust Company account and VanBuskirk, $37,931.22.

And the evidence with reference to the disbursement of the $13,400 left in First National Bank of Greensburg after the initial check for $156,600, which covered cashier's checks to that amount, shows that all of it but $1,000 was paid out to Barfod and VanBuskirk, or for the benefit and advantage of U. S. Plate Glass, and not for the benefit and advantage of Coal Operators.

We need not discuss whether the foregoing statement of facts, which were not disputed by the defendants, furnished sufficient evidence to sustain verdicts of guilty on counts 1 and 2, which charged the defendants with embezzlement *as officers of a corporation* (Sec. 827 of The Penal Code); for we have no doubt that the evidence was sufficient (see *Com. v. McKisson,* 8 S. & R. 420, 421) to sustain verdicts of guilty on counts 3 and 4 and 7 and 8; counts 3 and 4 charging the defendants with embezzlement as officers of a casualty insurance company, viz., Coal Operators Casualty Company, and counts 7 and 8 charging them with the fraudulent conversion of property of the said casualty insurance company. And the law is well settled that if the evidence supports a verdict of guilty on one count, which is sufficient to sustain the sentence, the judgment will be affirmed: *Henwood v. Com.,* 52 Pa. 424, 426-7; *Com. v. Prickett,* 132 Pa. 371, 374, 19 A. 218; *Com. v. Holgate,* 63 Pa. Superior Ct. 246, 255; *Com. v. Stern,* 58 Pa. Superior Ct. 591, 603; *Com. v. Bitler,* 133 Pa. Superior Ct. 268, 281, 2 A. 2d 493.

The assignments of error will be considered under four main heads.

1—*The assistant district attorney's opening remarks.*

The prosecuting attorney, in outlining the Commonwealth's case, referred to the fact that it might or might not come out that the defendants had acquired the stock of Coal Operators Casualty Company by unlawful means, but that it was not being charged in this case, for that crime, if it was one, was committed in Westmoreland County, and they were concerned in this case only with what happened in Philadelphia County. Thereupon counsel for the defendants said: "Now wait a minute. I object to that. *I am not going to ask for a withdrawal;* but my friend cannot inferentially speak about something in some other jurisdiction. As a matter of fact, there is no such thing in being; but he has no right to refer to it, and I am going to ask your Honor at the proper time to caution the jury. He has no right to say anything like that. The Court: I think you are right, Mr. Berkowitz. Mr. Barr: I understood that was going to be brought out, and I only mentioned it because I thought it was going to be brought out. I understood he was going to use that as part of his defense. Mr. Berkowitz: *I am not going to ask for the withdrawal of a juror.* The Court: I think we should wait until that question arises."

Counsel for the defendants thus twice told the court he was not asking for the withdrawal of a juror, and he is concluded by his action.

It turned out that counsel for defendants did go into the matters occurring in Greensburg, as matter of defense, and no harm was done defendants by the reference. The illegality of the defendants' withdrawal of $170,000 of Coal Operators cash and their deposit of it to the credit of U. S. Plate Glass fully appeared from the testimony of the defendants themselves. Jurors are not conversant with the laws or rules relating to 'venue',

and in view of the testimony of the defense it would not have been improper to explain why they were not being tried in Philadelphia for their illegal action in Greensburg.

But, in any event, the defendants got what their counsel asked for—a caution by the court to the jury—and new and additional counsel cannot now disavow what was done pursuant to trial counsel's request. The first assignment is overruled.

2—*Mr. Denby's conduct at the trial.*

Mr. Charles Denby, a member of the firm of Reed, Smith, Shaw and McClay, or an associate of that firm, and a reputable attorney of Pittsburgh, represented Mr. Robertshaw in the preparation of the option and agreement with VanBuskirk above referred to. He also represented Mr. Robertshaw and other persons concerned in saving Coal Operators from being taken over by the Insurance Commissioner after it was discovered *on November 20, 1940,* that contrary to the assertions of the defendants that all the securities of Coal Operators remained in the safe deposit box of the Company in the Pennsylvania Company's keeping as depositary, they had abstracted and removed U. S. bonds of the par value of $299,800, with a market value of $325,000, belonging to Coal Operators, and deposited them with Girard Trust Company as collateral security for a loan to U. S. Plate Glass of $250,000, and had checked out nearly all of that amount to make good the illegal conversion of $170,000 of Coal Operators money to the use and benefit of U. S. Plate Glass and themselves as owners of its stock, and for other uses and purposes for the benefit of themselves and U. S. Plate Glass. He (Denby), more than any other person, was conversant with the details of the embezzlement and fraudulent conversion committed by the defendants as officers of Coal Operators for their own use and benefit and that of U. S. Plate Glass,

and with the steps taken after November 20, 1940, to reorganize and rehabilitate Coal Operators so as to save it from receivership and winding up its business; for he conceived and carried to completion the plan by which $255,000 was raised to pay off the $250,000 loan in the Girard Trust Company secured by $325,000 (market value) of Coal Operators' U. S. bonds, and to obtain the return to Coal Operators of their securities pledged as collateral, and to pay J. W. Sparks & Co. $5,000 to release the 300 shares of stock held by it as collateral for loans to U. S. Plate Glass.[1]

At the trial Mr. Denby sat near the assistant district attorney, who represented the Commonwealth, but he was not there as private counsel assisting the district attorney in the trial of the case, as he might have been, (see *Com. v. Eisenhower*, 181 Pa. 470, 477, 37 A. 521), but as a witness, who in his professional capacity as a lawyer had familiarized himself with the details of the case and could supply the Commonwealth's officer with such information as the latter needed, and which he (Denby), acting on behalf of his clients, had obtained before he made the complaint, on their behalf, against these defendants. Mr. Denby took no part as counsel in the trial of this case. He made no address to the jury, opening or closing; he asked no questions on direct or cross-examination of any witness for the prosecution or the defense; and he made no argument or address to the court. All that he did, besides testi-

---

[1] While not material to this case, this $255,000 was contributed as follows: Aetna Ins. Co., which insured Coal Operators, put in $25,000; Girard Trust Co. and Lloyds Ins. Co., its insurer, put in $40,000; U. S. Plate Glass as reorganized after the elimination of the defendants' control, and its insurance carrier, put in $35,000. The balance was paid out of Coal Operators' funds raised by selling 1,000 new shares at $250 a share (in place of the old shares turned in) of which Robertshaw paid in $120,000 for 480 shares, turning in 700 shares of old stock.

fying as a witness in rebuttal for the Commonwealth to the relevant facts within his personal knowledge, was on two or three occasions to correct Mr. Robertshaw as to certain minor details of his testimony on cross-examination, as to which the latter's recollection was at fault, so as to have it conform to the facts suggested by Mr. Berkowitz, counsel for defendants. The rule against counsel acting as a witness on the trial of a case applies only to counsel *trying the case,* not to the fact that a witness happens to be a lawyer. There was nothing in Mr. Denby's conduct on the trial of this case that was not in consonance with the ethics of the legal profession. The second and third assignments of error are overruled.

3 and 4. *The charge of the court.*

Appellants complained (3) of the failure of the court, after stating fully the Commonwealth's case, to devote more attention than it did to the defense; and (4) of the action of the court—after defendants' counsel had requested some instructions with respect to the merger of the companies, alleged to have been contemplated by the appellants, which they said was intended also to take over and include a third company, known as Pennsylvania Casualty Company of Lancaster—in referring to the plan as "a plan, which is somewhat vague."

Taking up (3), the defendants really had no defense. They admitted all the facts testified to by the Commonwealth's witnesses as outlined above. The position that VanBuskirk and Barfod took was that as they were the holders of record of all the stock of both corporations, U. S. Plate Glass and Coal Operators—even though practically all this stock was pledged as collateral security for indebtedness—they could do as they pleased with the *assets* of both corporations, irrespective of the obligations and liabilities of each. To state the proposition is to refute it; and to ask a judge so

to instruct a jury would be a reflection on the intelligence of the court. The defendants knew better. Van-Buskirk was experienced in corporate business affairs and Barfod had been Deputy Secretary of Banking, and Insurance Commissioner, under Governor Pinchot.

The owner of all the stock of even an ordinary business corporation is not the corporation. The corporation and the aggregate of individuals who own its stock are considered identical, as over against the theory of a corporate entity distinct from the aggregate of individuals comprising it, only when "justice or public policy demand it and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless." *Tucker v. Binenstock*, 310 Pa. 254, 263, 165 A. 247. See *Pearl Assurance Corp. v. Nat. Ins. Agency*, 151 Pa. Superior Ct. 146, 158, 30 A. 2d 333, and cases cited, 151 Pa. Superior Ct. pp. 158-9. The corporate entity will be disregarded when it is necessary to protect the rights of innocent parties, but not when such action would favor chicanery and fraud, and prejudice innocent parties.

But these two companies were not ordinary business corporations. They were insurance companies subject to rigid supervision and control by the State for the benefit of such of the public as might be policy holders. Coal Operators was a casualty insurance company, bound by the law of this Commonwealth to maintain a reserve against unpaid losses[2], which for that company in August 1940, was fixed at $936,524.93, and

---

[2] While the Supreme Court of the United States in *McCoach v. Ins. Co. of N. A.*, 244 U. S. 585, a case dealing with the taxable net income of a Pennsylvania fire insurance company, held that such a company was not required by the law of this State to maintain a *reserve against unpaid losses*, but only a reserve for reinsurance, the opinion writer recognized (p. 588) "with respect to casualty companies and these only, that a reserve [must] be maintained against unpaid losses."

with other reserves for unearned premiums, loss adjustment expenses, bureau assessments, etc. and taxes accrued and commissions payable, etc., amounting to $206,767.51, left only $176,189.11 as the value of the capital stock and surplus, the interest of the stock holders.

To suggest that the owners, or holders of record, of this stock could abstract from its assets and securities, $936,000 of its bonds, or $325,000 of them, or $250,000, and, unbeknown to the Insurance Commissioner, or the policy holders and creditors of the corporation, appropriate and use them for the benefit and advantage of themselves or of another insurance company of which they happened to be the holders of record of all the stock, is simply preposterous. The assets and securities of one such corporation cannot be abstracted and appropriated to another such corporation, to the advantage of the stock holders of the latter and the injury and detriment of the policy holders and creditors of the former. It amounts to embezzlement and fraudulent conversion on the part of the officers of the corporation guilty of doing it.

As to (4), the court below was fully justified in referring to the 'plan of merger' as 'vague'. There was no substantial evidence in the case of any merger that had advanced towards completion far enough to avail these appellants as a defense to these indictments. The only documentary evidence relating to such a merger was an agreement (Defendants' Exhibit No. 15), dated August 20, 1940—the same day the option was secured from Robertshaw—between U. S. Plate Glass, acting by VanBuskirk as president and Barfod as secretary, of the first part, and VanBuskirk, individually, of the second part—in other words, VanBuskirk agreeing with VanBuskirk and his dummy directors. It provided, inter alia, that VanBuskirk agreed to acquire for and on behalf of U. S. Plate Glass

all of the outstanding capital stock of Coal Operators Casualty Company, at a price not to exceed $500,000; and all of the capital stock of Pennsylvania Casualty Company of Lancaster, Pa., at a price not to exceed $750,000; and to *cause one Ralph Sorrentino* of Brooklyn, N. Y. *to enter into an underwriting contract* for the sale of 95,000 shares of capital stock of U. S. Plate Glass, to be issued, of the par value of $5 each, at a price of $14.25 per share, so as to make available to the Company, as a result thereof, the sum of $1,353,750. The terms of this agreement and of the proposed underwriting agreement with Sorrentino are very revealing, when considered in connection with the financial status of U. S. Plate Glass on August 1, 1940, as before outlined.

The agreement recites the option with Robertshaw, before referred to, but makes no mention of any agreement secured by VanBuskirk for the purchase of the capital stock, assets and business of Pennsylvania Casualty Company, for there was none. Yet he and his counsel have talked and argued as if VanBuskirk's promise or agreement to acquire Pennsylvania Casualty was equivalent to his having done so.

As consideration for the agreements to be performed by VanBuskirk, U. S. Plate Glass agreed to pay him $1,500,000, and that "such sum or portions thereof shall be paid and/or advanced to VanBuskirk as he may require and use the same for acquiring for [U. S. Plate Glass] Company the various businesses and assets herein mentioned."

This record shows that neither U. S. Plate Glass nor VanBuskirk was in a position to raise any considerable sum of money by legal methods.

In the *proposed* underwriting agreement between U. S. Plate Glass and Sorrentino, which was attached to Exhibit 15, as Exhibit D, *but was not dated nor signed,* the company represented that 100,000 shares of

its capital stock shall be outstanding [they were not at the time]; that it owns and controls, or will become the owner of, or in control of, all the assets and/or common stock of the Coal Operators Casualty Company *and the Pennsylvania Casualty Company,* and Sorrentino *agreed to cause registered security dealers* in Pennsylvania to purchase 95,000 shares of U. S. Plate Glass at a price of not less than $14.25 a share, viz., 20,000 shares within *two weeks* from date, 10,000 shares within *thirty* days, 30,000 shares within *sixty* days,[3] and 35,000 shares within *ninety* days.

The underwriting agreement provided that *when U. S. Plate Glass has received the sum of $1,353,750* as a result of this underwriting, or the sale of the shares of its capital stock, all of the business and assets of U. S. Plate Glass, Coal Operators Casualty and Pennsylvania Casualty *shall be combined and/or consolidated,* and U. S. Plate Glass will then apply to the various state insurance commissioners for authority to transact business in said states.

It also provided that "any and all prior agreements pursuant to which Sorrentino has undertaken the sale of the capital stock of [U. S. Plate Glass] Company are hereby terminated and cancelled for all purposes whatsoever, and Company agrees to cause a termination and cancellation of a certain agreement between Sorrentino and Houghton E. VanBuskirk, dated Feb-

---

[3] The defendants' fraudulent abstraction and conversion of Coal Operators' $299,800 U. S. bonds was not discovered until November 20, 1940. That was sixty-one days after the date of the agreement between VanBuskirk and U. S. Plate Glass relied upon by defendants, and not one dollar had been paid to the Company under the underwriting agreement, if it was actually entered into; and VanBuskirk was already obligated under his agreement with Robertshaw to replace the certificate for 700 shares of Coal Operators stock, held by Barclay-Westmoreland Trust Co. as depositary, on January 15, 1941 with U. S. bonds to the amount of $367,125.

ruary 29, 1940, as extended by. agreement dated May 29, 1940."

Who Sorrentino was, his financial responsibility, etc., do not appear in this record. We only know that, apparently, he had been involved with VanBuskirk in an attempt to sell U. S. Plate Glass stock since February 29, 1940. It does not appear that he met with any success.

But the whole project was conditioned on the purchase of *all* the capital stock of *Pennsylvania Casualty Company* as well as of Coal Operators Casualty Company, and on the performance of many other things that had not even been started by August 20, 1940, and it contained so many conditions not within the power of U. S. Plate Glass or of VanBuskirk and Barfod to perform that plenty of loopholes existed permitting Sorrentino, if he is financially responsible to the extent called for by the proposed agreement, and if he did sign it—of both of which there is no evidence—to withdraw from the contract without liability to any one. It certainly furnished no warrant or justification for the unauthorized and fraudulent abstraction by these defendants of $325,000 worth of Coal Operators bonds from its safety deposit box and their appropriation and conversion of them to their own use and benefit and to that of another corporation owned and controlled by them; and the trial judge would have been justified in so charging the jury. Assignments six and seven are overruled.

The other assignments do not merit extended consideration. The court did not err in refusing to permit further cross-examination of the Commonwealth's witnesses on collateral and extraneous matters. It would have served only still more to befog and becloud what was really a comparatively simple matter; which is probably what it was intended to accomplish.

The court's charge, considered as a whole, contained

sufficient and adequate instructions as to 'reasonable doubt'.

Our prior discussion has disposed of the assignments relating to the overruling of the defendants' demurrer to the evidence, their point for a directed verdict of not guilty, and their motion for a new trial.

The assignments of error are all overruled. The judgments are severally affirmed; and it is ordered that the defendants, Houghton E. VanBuskirk and Einar Barfod, severally appear in the court below at such time as may be fixed by that court and that each of them be committed by said court until he has complied with his sentence or such part thereof as had not been performed when his appeal was made a supersedeas.

Judge RENO took no part in the hearing, consideration or decision of this case.