## Commonwealth *v.* Andrew, Appellant.

Argued April 14, 1955. Before HIRT, ROSS, WRIGHT and ERVIN, JJ. (RHODES, P. J., GUNTHER and WOOD-SIDE, JJ., absent).

*Leon Rosenfield,* with him *John Patrick Walsh,* for appellant.

*Victor Wright,* Assistant District Attorney, with him *William J. Brady, Jr.,* Assistant District Attorney, and *Samuel Dash,* Acting District Attorney.

OPINION BY HIRT, J., July 21, 1955:

The defendant, the President and a Director of Seaboard Mutual Casualty Company, was convicted of the fraudulent conversion of $48,209.57, and also of embezzlement of the funds of the corporation in that amount under §§827 and 828 of The Penal Code of

June 24, 1939, P.L. 872, 18 PS §§4827, 4828. He has appealed from the sentence imposed, contending that in law, under the facts as to which there is little serious dispute, he is not guilty.

The Seaboard Mutual Casualty Company was organized by the defendant and was incorporated on May 15, 1933. Throughout the life of the company the Board of Directors tacitly clothed him with broad authority in the conduct of its affairs. Defendant received no salary from the company. He however profited from business related to insurance contracts written by Seaboard, as we shall call it, through two companies which he operated as sole owner, viz: James A. Andrew Insurance Agency, a corporation, and Keystone Adjusting and Investigating Company. The agency corporation was the general agent for Seaboard and received commissions from it on contracts of insurance written in its name. The adjusting company settled its losses.

The laws of the State of Maryland required that a mutual insurance company have a surplus of at least $50,000 to qualify for doing business in that State. Seaboard had been writing insurance in Maryland. During 1947, particularly, serious inroads had been made on Seaboard's surplus. The company however was not in apparent financial difficulty and it still could lawfully write insurance contracts in Pennsylvania. To qualify for continuing its business in Maryland however it was necessary for Seaboard to restore its surplus to the amount which would meet the minimum requirements of that State. Defendant undertook personally to raise $50,000 for this purpose. On December 18, 1947, the National Bank of Germantown loaned him $48,000 on his personal note. With the proceeds, together with an additional sum supplied by the defendant, the bank bought United States Government bonds in the sum of $50,000. On receipt of the bonds they were delivered by

the bank to the defendant and were deposited by him with Seaboard to re-establish a surplus in the amount necessary to continue the operation of its mutual insurance business in Maryland.

Over a period beginning in 1938 various persons, in addition to the defendant who were interested in Seaboard, had advanced funds to it to create surplus funds necessary to meet the growing demands of the company's business. These advancements were made under §809 of Article VIII of the Act of May 17, 1921, P.L. 682, 40 PS §919, which provides: "Any director, officer, or member of any mutual insurance company, other than a mutual life company, or any other person, may advance to such company any sum or sums of money necessary for the purpose of its business or to enable it to comply with any of the requirements of law. Such moneys, and such interest thereon as may have been agreed upon, not exceeding ten per centum (10%) per annum, shall not be a liability or claim against the company or any of its assets, and shall be repaid only out of the *surplus earnings* of such company. No commission or promotion expenses shall be paid in connection with the advance of any such money to the company, and the amount of such advance shall be reported in each annual statement." (Italics supplied). On depositing the above bonds with the company, the defendant received a "Surplus Fund Debenture" from Seaboard which acknowledged its indebtedness to him in the sum of $50,000 with interest at 6% per annum. The debenture recited that it was issued in accordance with the provisions of the 1921 Act, supra, and specifically provided that *"the principal and interest shall be payable out of the earned surplus as apportioned for that purpose by the Board of Directors."* (Emphasis added). This debenture was delivered to the National Bank of Germantown by the defendant

as collateral security for the payment of his note. The note was renewed from time to time and on demand of the bank in May 1951, after it had seen a recent financial statement of the company, an insurance policy on the life of the defendant was assigned to it as additional collateral security. For a number of reasons to which we need not refer specifically since none of them relieves the defendant from responsibility, the affairs of Seaboard deteriorated rapidly to such an extent that the bank pressed defendant for the payment of its note. The loan was paid off by defendant on November 27, 1951. The funds which he used for the purpose were the proceeds of a check of Seaboard dated November 27, 1951, drawn to the order of defendant in the sum of $48,209.57 which he obtained from Seaboard in payment of Surplus Fund Debentures which he owned. The check was signed on behalf of Seaboard by the defendant as President and by H. M. Bookman, as Assistant Secretary and Treasurer of the corporation. Although under a resolution of the Board of Directors of April 27, 1938, as well as by the terms appearing on its face, the payment of a debenture required Board action, there was no such authorization in this case. The check was honored and was paid out of funds in Seaboard's bank account on the signatures of defendant and of Bookman alone.

Defendant's relation to the chain of events, ending in the dissolution of the Seaboard corporation charges him with fraudulent intent when he appropriated funds of the corporation under the guise of redemption of debenture certificates held by him. During the first nine months of 1951 the total insurance written by Seaboard was $548,651 less than in the same period of 1950. Between August 1, 1950 and November 30, 1951, Seaboard's income exceeded what it was obliged to pay out, in only two months, and by the end of the

period total payments had exceeded income by $526,091. On August 1, 1950, Seaboard owned securities worth $545,000. Sales of its securities during the following fourteen months amounted to $454,866 and on November 30, 1951, it had left only $30,000 in bonds in its investment account. Defendant testified that the sales of securities were made to pay Lloyds of London. But the books show payment of only $82,249 to Lloyds and a total received by Seaboard from Lloyds of $108,364, during the period. Because of notice by the defendant to the Board of Directors that Seaboard did not have assets equal to its unearned premium reserve and other liabilities, the Board on April 12, 1951, under the Act of May 17, 1921, P.L. 682, §808, 40 PS §918, levied an assessment on Seaboard policy holders for the years 1948, 1949 and 1950. The total assessment billed to policy holders amounted to $947,637. This was set up on Seaboard's books for the year 1951 as an asset less an estimated reserve for uncollectible assessments of 50% of that amount. By carrying the sum of $452,-401 as an asset, the company's books reflected a balance which was designated on the books as a surplus, in the sum of $302,832. Defendant contended that he relied on this showing of a surplus on Seaboard's books when on November 27, 1951, he cashed the check in question drawn on the company's account in the sum of $48,209.57. The cash balance in Seaboard's bank account after the withdrawal, was but $5,214. Although Board action under the 1938 resolution was required in the redemption of any debenture and by the specific terms of the debentures an apportionment out of "earned surplus" by the Board of Directors was necessary, defendant by-passed these requirements. The company's check in payment of debentures held by defendant was drawn without the knowledge of the Board. Moreover, Bookman, who as Secretary and Treasurer

on signing the check, received $1,000 of the proceeds from the defendant in exchange for a debenture certificate in that amount which Bookman owned.

Other events in close succession following the cashing of the check point to defendant's fraudulent intent in the transaction. On November 29, 1951, insurance policies of nine persons, some of whom were personal friends of the defendant were cancelled by Seaboard on defendant's order and were rewritten in another and solvent company represented by him. By November 30, 1951, Seaboard had collected only $68,608 on the assessments from policy holders. And on that date, *three days after defendant had received the cash in question,* defendant on behalf of the company wrote the Insurance Commissioner of Pennsylvania, stating: "I wish to advise that the Seaboard Mutual Casualty Company is not collecting the assessments as anticipated. The Company cannot continue to do business." And on December 5, 1951, five days later, the Board of Directors by resolution requested the Insurance Commissioner, as receiver, to take over the Company. The resolution recites that it was adopted on the representation of "James A. Andrew, President, that the Company has a substantial deficit and its condition will be hazardous to policy holders, and creditors and to the public."

On the date when defendant received the company's funds in question Seaboard had an actual deficiency in assets because only $68,608 in assessments had been collected. Little more has since been collected from policy holders by the Insurance Commissioner so far as disclosed by this record. But even if the assessment had provided funds sufficient to meet the requirements of the 1921 Act, supra, the surplus so restored could not be characterized as "surplus *earnings*" from which debenture certificates could have been paid

off lawfully. The fund was an asset of the insolvent mutual casualty company to be applied, on final liquidation, to the company's creditors in order of their priority. Defendant under the circumstances did not have a legitimate claim in any amount on any of the assets of the corporation. This case was tried before Judge HAGAN, by agreement, without a jury. The credibility of the witnesses and the weight to be accorded their testimony was for the trial judge as finder of the facts (*Rosine v. Gerlach,* 173 Pa. Superior Ct. 240, 98 A. 2d 436) and the general finding of the judge has the force and effect of a verdict of a jury. *Glen Alden Coal Company v. Commissioners,* 345 Pa. 159, 169, 27 A. 2d 239. The testimony clearly supports Judge HAGAN's finding that the defendant fraudulently appropriated assets of Seaboard and used them for his own benefit. The evidence is also abundantly sufficient to sustain the adjudication of guilt on the counts under The Penal Code charging defendant with embezzlement of corporate funds as an officer of the company. Cf. *Commonwealth v. Van Buskirk et al.,* 155 Pa. Superior Ct. 613, 39 A. 2d 311; *Commonwealth v. Grant,* 121 Pa. Superior Ct. 399, 183 A. 663; *Commonwealth v. Huster,* 118 Pa. Superior Ct. 24, 178 A. 535. Under the testimony as reflected in the findings, the defendant stands convicted, as charged, beyond all reasonable doubt.

The trial judge on sentencing the defendant treated him more leniently perhaps than the circumstances admit. Under the terms of the sentence a fine of $5,000 will be remitted and the service of a prison term avoided, on the discharge by defendant of his civil liability to return to Seaboard's Receiver, the fund which he fraudulently converted.

Judgment of sentence affirmed and it is ordered that the defendant appear in the court below, at such

time as may be fixed by that court and that he be committed until he has complied with the sentence or such part thereof as had not been performed when his appeal was made a supersedeas.

WOODSIDE, J., took no part in the consideration or decision of this case.