## Barium Steel Corporation *v.* Wiley, Appellant.

**40**

Argued November 11, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and ARNOLD, JJ.

*Paul A. Mueller*, with him *Ralph M. Barley,* for plaintiff.

*Arthur Littleton,* with him *John W. Beyer, J. Wesley Oler, Arnold, Bricker & Beyer* and *Morgan, Lewis & Bockius,* for defendants.

OPINION BY MR. JUSTICE BELL, June 28, 1954:

Barium Steel Corporation, plaintiff in this case, is a Delaware Corporation which will be hereinafter referred to as "Barium". The defendants, Glen M. Wiley and (his wife) Effie K. Wiley, together owned 50% of the stock of Wiley Equipment Company, a Pennsylvania corporation, hereinafter referred to as the "Equipment Company". Of this 50% Mrs. Wiley owned only 2 shares. The other 50% of the stock was owned by a man named B. F. Diamond.

After several months' negotiations Barium and the defendants executed a written agreement dated *July 3, 1946,* in which the defendants agreed to sell to Barium, inter alia, all of their stock in the Equipment Company, as well as certain additional assets which are not here in issue. The purchase price was $225,000.,* payable $50,000. *in cash* at the date of closing and $175,000. in shares of common stock of Barium at the closing price of the stock on the day preceding the date of the closing. The agreement contained, inter alia, the following material warranties by the defendants, each of which was untrue:

"2. Sellers represent and warrant that

. . .

"(d) *The Balance Sheets, dated December 31, 1945,* of Wiley Equipment Company . . . *are in all respects true and correct and* together with the notes thereto *reflect all of the debts, obligations and liabilities of such companies,** fixed, contingent or otherwise as of that date . . . .

. . .

"(h) There are no actions, suits or proceedings of any kind pending or to their knowledge threatened against or affecting Wiley Equipment Company . . . or any of their properties, before any federal, state or other group or governmental commission, board, bureau or agency, other than as disclosed as in the attached Balance Sheets as of December 31, 1945.

. . .

"(j) There are no unpaid taxes due and payable by Wiley Equipment Company . . . in excess of reserves or accruals therefor [namely, $17,021.51] except in-

---

\* This was not a purchase of stock or assets at book or market value at a certain date, this was a purchase at a fixed price.

\* Italics throughout, ours.

come and excess profits tax deficiencies not yet proposed or assessed for 1945; . . ."

We construe this agreement of purchase and the purchase price stipulated therein to have been made and based upon the balance sheets of the Equipment Company as of December 31, 1945, and upon the amount of reserves therein set forth, namely, $17,021.51.

The agreement of July 3, 1946 further provided that if, prior to the closing date, the defendants had not or could not comply with all of their obligations, Barium at its option could terminate the agreement and be relieved from all obligations thereunder. Barium therefore had the right, up to closing, (a) to terminate the contract for breach by the defendants, or (b) to purchase and settle for the stock and thereafter hold the defendants for breach of any of their warranties: The Sales Act of May 19, 1915, P. L. 543, §69, 69 PS, §314. Barium chose the latter course.

When the parties met to conclude settlement on July 31, 1946, it appeared likely that Barium would terminate the agreement of July 3rd. In order to avoid this, the defendants signed the following letter dated July 31, 1946, addressed to Barium and prepared by Barium's attorney*:

"July 31, 1946

Barium Steel Corporation,
60 Wall Street,
New York, N. Y.
Gentlemen:

Referring to my representation and warranty made in paragraph 2(j) of the Purchase Agreement, dated July 31, 1946, between us, I hereby reiterate that there are no unpaid taxes or taxes due and payable by Wiley Equipment Company . . . in excess of reserves or ac-

---

* Not present counsel.

cruals therefor *for the year 1944* and in the event that any shall be assessed on either of such companies, I agree, in consideration of your waiving certain obstacles to the Closing, as provided in such Agreement, to guarantee, in the case of . . . full payment, and in the case of Wiley Equipment Company *not less than fifty per cent* (50%) of all amounts assessed or declared deficient.

Yours very truly,
Glen M. Wiley
Effie K. Wiley"

This letter is the origin and cause of almost all of the confusion, differences and difficulties in this case. The parties agree that the date of the purchase agreement referred to in this letter, viz., July 31, was erroneous; but they differ radically on what was meant by the defendants' guarantee "to pay not less than 50% of all amounts assessed or declared deficient". It is admitted or conceded that plaintiff performed all the terms and obligations imposed upon it by the agreements of July 3 and July 31, 1946.

Barium sued the defendants in assumpsit for breach of their warranties under the July 3rd agreement, claiming to be paid for *all* the tax deficiencies (above the reserves) for 1943 and 1944. The trial Court submitted the entire matter to the jury for determination, including the interpretation of the two agreements. The jury found for the plaintiff in the sum of $23,876.01— exactly *one-half* of the amount of its total claim (with interest), namely, one-half of $58,607.51 or $29,303.75, less the counterclaim of Glen M. Wiley for salary, namely, $5427.75, which it allowed as a credit against plaintiff's claim. Thereafter the Court below, in disposing of the motions for judgment n.o.v. and for a new trial, which were filed by each of the parties, construed the agreement of July 3, 1946 and of July 31,

1946 as a matter of law and entered judgment in favor of the plaintiff on its claim in the sum of $35,898.90, representing all of the 1943 deficiencies and one-half of the 1944 deficiencies above the aforesaid reserves of $17,021.51. The Court likewise entered judgment in favor of Glen M. Wiley and against the plaintiff on his counterclaim in the sum of $4,500. The Court disallowed interest to the plaintiff as well as to Glen M. Wiley.

The agreement of July 3, 1946 was clear, and being clear its interpretation was for the Court: *Fischer & Porter Co. v. Porter*, 364 Pa. 495, 500, 72 A. 2d 98. The agreement of July 31st, especially because of the words "not less than 50%", was obscure, doubtful or ambiguous and therefore parol evidence was admissible to explain the ambiguity or clarify the obscurity: *Albert v. Schenley Auto Sales, Inc.*, 375 Pa. 512, 100 A. 2d 605; *Waldman v. Shoemaker*, 367 Pa. 587, 591, 80 A. 2d 776; *Security Trust Company of Pottstown v. Stapp*, 332 Pa. 9, 13, 1 A. 2d 236; *Kittaning Coal Co. v. Moore*, 362 Pa. 128, 66 A. 2d 273. The agreements of July 3rd and of July 31st must, if reasonably possible, be interpreted together; and if two reasonable constructions are possible, they should in case of doubt be interpreted against the party who drew them: *Betterman v. American Stores Co.*, 367 Pa. 193, 203, 80 A. 2d 66; *Commonwealth, to use, v. Horst*, 364 Pa. 403, 406, 72 A. 2d 131; *Hempfield Township School District v. Cavalier*, 309 Pa. 460, 164 A. 602.

In the light of the foregoing facts, we shall analyze several of the various constructions and contentions which each party urges.

Barium now contends, if we understand its contention, that the July 31st agreement was surplusage and did not change or affect the agreement of July 3rd; and therefore Barium was entitled to recover in full

all (100%) of the tax deficiencies (less the reserves shown in the 1945 balance sheets) assessed against the Equipment Company for 1943 and 1944 under the warranties of the defendants contained in the agreement of July 3rd. This contention is not supported by the language of the agreement or letter of *July 31st* and we cannot treat its language as meaningless; therefore plaintiff's contention on this point is rejected.

The interpretation most strongly contended for by defendants is equally devoid of merit, namely that the letter of July 31st limited here and reduced defendants' warranty of tax deficiencies for the years 1943 and 1944 to a guarantee of 50% for the year 1944 alone.

Parol evidence being admissible to clarify this ambiguous agreement, we shall consider the parol evidence which was produced.

The defendant, Glen M. Wiley, testified: ". . . Mr. Sisto says, 'There is nothing to prevent this deal from being completed except one thing, our audit has shown there might be some more taxes due in 1944, and we have prepared a form that we want you to sign, Mr. Wiley.' 'Well,' I said, 'where is it?' They showed it to me, that *we guaranteed to take care of any additional taxes*. Well, Diamond, he commenced to talk and said if there is going to be any argument like that, he didn't know anything about that, he was going to send in his own auditors. Sisto hit the table and said, 'You are either going to sell now or the deal is all off. We have been talking about this for months.' This sort of stopped Diamond and I thought maybe Diamond is going to kill this whole deal in a minute.* I knew we had approximately $17,000.00 reserved for taxes for 1944, and knowing what had occurred since that

---

* Barium was anxious to purchase Diamond's stock and it was stated at oral argument that it did so.

[time] *I couldn't conceive much additional* taxes. They might find a small amount here but in no event could it be bad. Rather than see the deal disrupted, I said 'I will sign.' When I signed, Mrs. Wiley signed." There is nothing in the evidence to show what was meant by "additional taxes".

Wiley's testimony threw little if any additional light on the agreement of July 31st, although it seems to us to refute defendants' present contention that the letter or agreement of July 31st was intended to modify the agreement of July 3rd by limiting and reducing defendants' warranties for all years prior to 1945 to a 50% guarantee for the year 1944 alone. Why should Barium or any purchaser, who has a guarantee for two years' taxes, accept a new guarantee reduced and limited to 50% for one year and also waive some of its objections in order to close a deal which, according to defendants' own testimony, Barium was reluctant to consummate?

The jury resolved this perplexing dilemma (as we have seen) by giving Barium, which bought Wiley's one-half of the stock of the corporation, one-half of the tax deficiencies (above the reserves) for 1943 and 1944 (plus interest, less Wiley's claim for salary plus interest).

We come then to the real crux of the defense, namely, that Barium cannot recover at all, because *it* did not pay the deficiencies in taxes assessed against the Equipment Company for 1943 and 1944, and therefore it suffered no loss or damages.

Defendants admit that they made the warranties contained in the aforesaid agreements and concede that Barium fully performed its obligations. It is likewise admitted or indisputable that the agreements and warranties were breached. Unquestionably Barium could sue the defendants in its own name for a breach

of any of defendants' warranties and could recover all damages, if any, which it suffered from a breach. Cf. *Kusmaul v. Stull*, 356 Pa. 276, 51 A. 2d 602; *Smiler v. Toll*, 373 Pa. 127, 94 A. 2d 764; *Spires v. Hanover Fire Insurance Co.*, 364 Pa. 52, 70 A. 2d 828.

The crucial question is, did Barium suffer any loss and if so, what is the measure of its damages? Barium bought all of the stock of, and wholly owned Equipment Company; Barium wholly owned Clyde Iron Works, Inc.; Clyde wholly owned Wiley Manufacturing Company, to whom it transferred all of the assets of Equipment Company, having acquired them through various transfers. The deficiencies assessed by the Government against Equipment Company had to be paid by Equipment Company or under revenue regulations by the *transferee* of the assets of Equipment Company, namely, Wiley Manufacturing Company. The latter actually paid all the tax deficiencies.

There appears to be no clear test or well settled rule either in Pennsylvania or in the Country at large as to exactly when the corporate veil can be pierced and when it may not be pierced (see Fletcher Cyclopedia Corporations, Vol. I, Chapter 2, §41, page 134, et seq.). It is well established that a corporation is a distinct and separate entity, irrespective of the persons who own all its stock. The fact that one person owns all of the stock does not make him and the corporation one and the same person, nor does he thereby become the owner of all the property of the corporation. The shares of stock of a corporation are essentially distinct and different from the corporate property: *Monongahela Bridge Co. v. Pittsburgh & Birmingham Traction Co.*, 196 Pa. 25, 28, 46 A. 99; *Homestead Boro. v. Defense Plant Corp.*, 356 Pa. 500, 508, 52 A. 2d 581. Nevertheless, we have repeatedly held that Courts can go behind the corporate entity, "whenever justice or public policy demand it and when the

rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless.": *Tucker v. Binenstock,* 310 Pa. 254, 165 A. 247. The same principle was enunciated in *Waring v. WDAS Broadcasting Station, Inc.,* 327 Pa. 433, 194 A. 631; *Commonwealth v. VanBuskirk,* 155 Pa. Superior Ct. 613, 631, 39 A. 2d 311; *Great Oak B. & L. v. Rosenheim,* 341 Pa. 132, 136, 19 A. 2d 95; *Edirose Silk Mfg. Co. v. First National Bank & Trust Co.,* 338 Pa. 139, 143, 12 A. 2d 40; *Stony Brook Lumber Co. v. Blackman et al.,* 286 Pa. 305, 133 A. 556. In the *Edirose* case, supra, this Court said (page 143): ". . . In an appropriate case and where, as here, justice to all parties requires it, this Court will not hesitate to treat as identical the corporation and the individual or individuals owning all its stock and assets. . . ."

Under all the facts and circumstances present in this case, we hold, under the foregoing authorities, that plaintiff was damaged by defendants' breach of warranties and could bring an action in assumpsit directly against these defendants for the damages it suffered, by reason of the payment by Wiley Manufacturing Company of the additional taxes assessed against Equipment Company for 1943 and 1944. More specifically, this means that Barium could recover against these defendants 50% of the tax deficiencies for the years 1943 and 1944, less $17,021.00 of reserves for the year 1944. Plaintiff's loss or damages under the aforesaid agreements were exactly that amount; they were neither theoretical nor nominal, nor were they the difference, as defendants contend, between the value of the stock held by Barium immediately before the assessment of the taxes and its value immediately afterwards. Cf. *Yadusky v. Shugars,* 306 Pa. 92, 159 A. 2; *Calvey v. Coyer,* 121 Pa. Superior Ct. 504, 184 A. 279.

In *Yadusky v. Shugars,* 306 Pa., supra, a buyer brought an action in assumpsit against the sellers to recover the amount of federal income taxes which were assessed against the Liberty Brewing Company, which plaintiff and the corporation were required to pay. The agreement in that case was, as here, between the buyer and the sellers of corporate stock. Defendants sold to plaintiff 395 shares of the Liberty Brewing Company stock, agreeing, inter alia, that with certain immaterial exceptions ". . . there are no debts owing by the Liberty Brewing Co., and if any other debts [except a first mortgage] be found that have been incurred by the Liberty Brewing Co. prior to October 10, 1920, that they . . . [will] be personally liable for the same. . . ." The Court held that plaintiff could recover from defendants the deficiency in income taxes for the year 1919 and that the measure of its damages was *the amount of tax actually paid.* The Court said (pages 96, 98) : ". . . It would be too narrow a construction of this undertaking, having in view the intention of the parties which it discloses, to hold, as appellants would have us, that the word debts does not comprehend taxes within the terms of this agreement. . . . As the manifest purpose of the agreement was to secure to the purchasers the value of the stock which they were buying and as the necessary effect of the levying of the additional tax was to reduce its value, these taxes were among the possible obligations against which the sellers were safeguarding the buyers. The vendors were responsible for the income tax return as it was made and they cannot escape responsibility to plaintiffs for what it failed to disclose under a narrow construction of the agreement which would not include taxes justly due and properly payable under the designation of debts.

"We cannot adopt the idea of appellants [sellers] that the measure of plaintiffs' recovery is the difference between the value of the stock held by them immediately before the assessment of the taxes and its value immediately afterwards, because that is not what the agreement provides. It stipulates that the sellers will pay the debts and be personally liable for the same."

Another analogous case is *Calvey v. Coyer*, 121 Pa. Superior Ct., supra. In that case plaintiff and defendant each owned 50% of the stock of a motor company. Defendant sold plaintiff his stock executing a written agreement under the terms of which plaintiff and defendant each agreed to pay one-half of whatever income taxes might be determined by the Federal Government to be due from the motor company prior to December 31, 1926. An additional tax was assessed against the motor company for the year 1923, which it or plaintiff paid. Plaintiff then brought an action in assumpsit against defendant on the aforesaid written contract and was allowed to recover 50% of the additional income tax so paid. The evidence was conflicting as to whether the company or the plaintiff actually paid the tax. The Court held it was immaterial whether the plaintiff or the motor company paid the tax and said: ". . . When the plaintiff purchased from the appellant and his wife their stock in the motor company, the consideration to be paid therefor was determined by the assets and liabilities of the motor company as they existed at that time. The corporate assets, on the one hand, and the corporate indebtedness, on the other, determined the value of the stock held by the appellant and his wife. Possible assessments for income taxes for the years 1923, 1924, 1925, and 1926 might have a material effect upon the valuation of the stock which the plaintiff was purchasing

from the appellant and his wife. Such possible assessments could not be calculated with certainty at the time, and the agreement between plaintiff and appellant was drawn to provide for this contingency and for a subsequent adjustment between the parties. It is apparent, when taking into consideration the entire transaction, the surrounding circumstances, and the object to be accomplished, that the contract in question was entered into between the plaintiff and the appellant, as individuals, for the sole purpose of making appellant liable to the plaintiff for one-half of any income tax assessed against the motor company for the years prior to 1927. . . . The contract being for the protection of the plaintiff, a clear implication is that, if either the plaintiff or the motor company paid the tax, appellant would pay to the plaintiff one-half thereof. It could make no difference to appellant which one paid the tax."

Section 69 of The Sales Act of May 19, 1915, P. L. 543, provides: "First. Where there is a breach of warranty by the seller, the buyer may, at his election,— (a) Accept or keep the goods, and set up against the seller the breach of warranty by way of recoupment in diminution or extinction of the price. . . . Sixth. The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty. . . ."

If no recovery can be had in the instant case against defendants, defendants never will be liable for their breach of warranties, because if the Manufacturing Company sues the defendants to recover under their warranties or guarantee the deficiencies in taxes which it was compelled to pay (by defendants' failure to pay the correct taxes), the defendants can avoid liability by pleading that there is no privity of contract between the Manufacturing Company and them-

selves, and that the agreements of July 3 and July 31 do not constitute a "third party beneficiary" contract. Cf. *Spires v. Hanover Fire Insurance Co.*, 364 Pa., supra. Moreover, if Barium can recover in this suit, it will be a complete defense to any action which Manufacturing Company might bring against these defendants for these tax deficiencies, under the agreement of July 3 and July 31, 1946.

Barium is likewise entitled to interest. When money is due a person under a contract but is improperly withheld or unpaid by the defendant, the party to whom such money is due is entitled to interest from the time it was due, at 6% per annum: cf. *Canuso v. City of Philadelphia*, 326 Pa. 302, 310, 192 A. 133; *Mack Paving & Construction Co. v. American Pipe & Construction Co.*, 283 Pa. 449, 451, 129 A. 329. In the *Mack Paving Co.* case, supra, the Court said (page 451) : "Interest is compensation allowed by law, or usage of trade or fixed by contract of the parties, for the use or detention of money: Phila. v. Com., 276 Pa. 12, 14; Koch v. Schuylkill County, 12 Pa. Superior Ct. 567, 572. 'It is a legal and uniform rate of damages allowed, in absence of any express contract, where payment is withheld after it has become the duty of the debtor to discharge the debt': Kelsey v. Murphy, 30 Pa. 340, 341; Minard v. Beans, 64 Pa. 411, 413; Koch v. Schuylkill County, supra. . . ."

Defendants contend that it is both inequitable and unjust to allow interest because, inter alia, the taxes were not paid as soon as assessed by the Government but were paid in instalments, and therefore defendants should not be required to reimburse plaintiff for interest which Manufacturing Company was compelled to pay as a result of its own delay. There is no merit in this contention. If the taxes had been paid as soon as the Government demanded them, the amount to be

paid would include interest to date of payment, and the plaintiff would be entitled not only to the interest actually paid to the Government, but also to interest which accrued thereafter on the amount actually paid to the Government. The interest payment is therefore as broad as it is long, and the defendants have not been harmed by the failure to promptly pay the deficiency in taxes plus interest as soon as it was demanded.

The next important question that arises is, can one of the defendants set off or counterclaim in this suit monies admittedly owing to him by the Equipment Company under his employment contract with the Equipment Company? The Court below correctly answered this question in the affirmative. The Equipment Company, as we have seen, was a wholly owned subsidiary of Barium. Barium in its contract of July 3, 1946 agreed as follows:

"5. Purchaser agrees that if and when it acquires all of the outstanding and issued shares of Wiley Equipment Company, it will cause said Company to enter into an agreement with Glen [M.] Wiley, as a consultant, for three years at a salary of $6,000.00 per year." A contract between Equipment Company and Wiley was entered into pursuant to this agreement and was breached by Equipment Company. If that were all, it would not warrant a set off or counterclaim. However, J. A. Sisto, chairman of Barium, wrote the following letter to defendant, Glen M. Wiley, dated June 24, 1948:

"This has reference to my letter to you, dated May 14, 1948, and your reply thereto, dated May 17, 1948, re the above captioned subject matter. I had hoped to receive, before this, the result of your accountant's checking into the matter, whom, according to your said letter, you had instructed on May 17th to pro-

ceed with such checking. *We do not want, again, to suspend monthly payments to you but unless we receive a more prompt definite reply from you, we will have no alternative than to suspend such payments again.*

"Your early reply will be appreciated.

J. A. Sisto"

Glen M. Wiley was, as we have seen, the owner of 48% or 49% of the stock of the Equipment Company and Mrs. Wiley was the owner of two shares. If the defense of "a separate corporation" or "a different separate corporate entity" is unavailing to the defendants in a suit by Barium, it should be equally unavailing to Barium in a counterclaim by this defendant against Barium, who not only promised to cause its wholly owned subsidiary to enter into a contract of employment with Glen M. Wiley, but stated two years later, that *it* would suspend his monthly payments. Under these facts and circumstances we hold that Glen M. Wiley is entitled to a counterclaim in this case and is likewise entitled to interest thereon.*

Defendants contend that they should have been permitted to prove that Barium had brought a similar suit against Diamond in Maryland for a loss arising out of these tax deficiencies, and that the Manufacturing Company likewise had brought a suit against these defendants for the same deficiencies. No offer was made to prove that Barium made any different averment there than here, or changed its position as far as these defendants are concerned. These suits were therefore either irrelevant or, at best for defendants, were collateral matters which would only have

---

* The jury's verdict was technically wrong because the suit was against Mr. and Mrs. Wiley and the counterclaim which was allowed was by Wiley alone, but the parties make no objection on this ground.

further beclouded the main issues and added to the existing confusion; for this and other reasons hereinabove set forth, defendants' offers were wisely excluded by the trial Judge.

We have considered all of the other arguments and contentions of each of the parties in this case but, finding no merit therein, deem further discussion unnecessary.

The judgment of the Court below is reversed; the verdict of the jury is reinstated and judgment entered thereon.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

The basic question in this case is whether, under a written agreement between Barium Steel Corporation, the plaintiff, and the defendants Wiley for the sale of certain shares of stock by the latter to the former, Barium has a right of action for the recovery of an expense allegedly sustained by Barium's corporate sub-subsidiary which was not in existence when the agreement was entered into, was not mentioned or even anticipated therein and, unquestionably, did not qualify as a third party beneficiary of the contract. The learned court below allowed Barium such a recovery, and this court now does likewise, on the theory of "piercing the corporate veil" by applying the doctrine in reverse for the benefit of the fabricator of the veil.

The contract between Barium and the Wileys, which was entered into on July 3, 1946, provided for the sale by the Wileys to Barium of their 50% holding of the capital stock of the Wiley Equipment Company, a Pennsylvania corporation, together with an unincorporated business wholly owned by Glen M. Wiley which is of no present moment. The agreement con-

cluded with the express stipulation that it should not be assigned by either of the parties thereto without the consent of the other. No such consent was ever sought or given and, of course, the agreement was never assigned.

The stock in the Wiley Equipment Company, as so contracted for, was delivered by the Wileys to Barium at the latter's office in New York on July 31, 1946, the closing date called for by the contract of July 3rd. At the same time, Barium also received from one Diamond, under a separate contract of purchase, the remaining 50% of the capital stock of Wiley Equipment Company.

A day or two after the Wileys and Diamond had delivered their shares in Wiley Equipment Company to Barium, the latter sold the entire lot to its wholly owned subsidiary, Clyde Iron Works, a Delaware corporation, for precisely the same price that Barium had paid for it. And, some two months later, viz., in September, 1946, Wiley Equipment Company transferred all of its assets to Wiley Manufacturing Company, a Delaware corporation. Clyde Iron Works was also the owner of the whole of the capital stock of the Wiley Manufacturing Company from August 1, 1946, onward. Thus, the relationship of these affiliated corporations was that Barium wholly owned Clyde, and Clyde wholly owned Equipment as well as Manufacturing, which latter corporation had also become the transferee of all of the assets of Wiley Equipment Company as already stated. The Equipment Company, having so disposed of its assets, was formally dissolved on March 11, 1947, upon the filing of articles of dissolution with the Secretary of the Commonwealth at Harrisburg.

The stock sales agreement of July 3rd between the Wileys and Barium contained a warranty on the part

of the Wileys that there were no unpaid taxes due and payable by the Equipment Company "in excess of reserves or accruals therefor except income and excess profits tax deficiencies not yet proposed or assessed for 1945." However, just prior to the closing on July 31st under the July 3rd contract, the Wileys, at the insistence of Barium, signed a letter prepared by Barium's attorney whereby, after a specific reference to the above-mentioned warranty in the July 3rd agreement concerning unpaid taxes of Equipment Company, the Wileys guaranteed payment of 50% of all unpaid taxes owing by Equipment Company assessed or declared deficient in excess of the reserves or accruals therefor.

On January 21, 1947, the Commissioner of Internal Revenue made a deficiency assessment with respect to Equipment Company's liability for excess profits for 1943 and, on July 12, 1949, made further deficiency assessments with respect to Equipment Company's income tax liability for 1943, its excess profits tax for 1944 and its income tax liability for 1945. These deficiency assessments became legally payable, and were actually paid, by Wiley Manufacturing Company as the transferee of Equipment Company's assets.

Inasmuch as the deficiencies exceeded the Equipment Company's stated reserves and accruals for taxes, Barium brought the instant suit against the Wileys under the contract of July 3, 1946, as supplemented by the letter of July 31st, seeking to recover in Barium's own name and right the amount of Manufacturing Company's tax deficiency payments in excess of Equipment Company's reserves for taxes notwithstanding that the payment of Equipment Company's deficiency taxes was at the expense of Manufacturing and not Barium; Barium had lost nothing whatsoever on its purchase and sale of the Wiley

stock in Equipment Company and it never paid out a penny on account of any tax liability owing by Wiley Equipment Company. However, the court below was of the opinion that Barium could assert such a claim in its own right, as the grandparent of Wiley Manufacturing Company, apparently on the theory that Wiley Manufacturing Company had a right of recovery under Barium's contract with the Wileys as a third party beneficiary. Such a conclusion is patently fallacious.

Neither the warranty in the agreement of July 3rd nor the supplementary letter of July 31st evidences any understanding of the parties thereto that the provisions of the contract and letter, respecting unpaid taxes chargeable to Equipment's operations, were to be for the benefit of someone other than Barium. Had such been the intention, then that fact should contemporaneously have been revealed to both of the contracting parties (the Wileys as well as Barium) before some other person could thereby acquire an interest as a third party beneficiary of the contract. In *Spires v. Hanover Fire Insurance Company*, 364 Pa. 52, 70 A. 2d 828, where the sole question was whether the plaintiffs could recover on a fire insurance policy in which they were not named as a party and in which they were not referred to in any manner whatsoever, our present Chief Justice declared (pp. 56-57) that,—

"To be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by *one* of the parties to the contract and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract. . . ."

The Wileys could not possibly have thought, when they executed the agreement of July 3rd and signed the letter of July 31st, that Manufacturing was there-

by acquiring a right under the contract. There is not the slightest suggestion in the evidence, nor could there be in the circumstances, that the Wileys had any knowledge that, the day following the closing under their contract with Barium, the latter would sell all of its Equipment Company stock to Clyde Iron Works and that Clyde, in turn, would sell the same stock to Wiley Manufacturing Company. Indeed, it was only on July 24th (just one week before the closing) that Barium had caused Manufacturing to be incorporated and organized, and there is no evidence that even Manufacturing's name, let alone an interest on its part, ever figured in the transactions between Barium and the Wileys.

Furthermore, if Manufacturing were in reality a third party beneficiary, it was necessary under Rule 2002 (a) of the Pa. R. C. P. that it sue on its cause of action in its own name. The court below sought to avoid that requirement by applying the exception contained in Rule 2002 (b) (2) which provides that "(b) A plaintiff may sue in his own name without joining as plaintiff or use-plaintiff any person beneficially interested when such plaintiff . . . (2) is a person with whom or in whose name a contract has been made for the benefit of another." The case of *Kusmaul v. Stull*, 356 Pa. 276, 51 A. 2d 602, where the exception was applied and upon which the court below relied, presented an entirely different situation than is here involved. In that case, the contract for the sale of realty by the defendants was, to the knowledge of all parties to the agreement, for the benefit of a third person rather than the named vendee: see p. 278. Here, the warranty and guarantee were made for Barium's own benefit and not for the benefit of another. Hence, exception (b) to Rule 2002 Pa. R. C. P. is not presently applicable.

Since the warranty and the guarantee concerning unpaid taxes of Equipment Company were for Barium's benefit, it follows that any damage for the Wileys' breach of the warranty or their failure to fulfill the guarantee would have to be shown to have been suffered by Barium before it could recover substantial damages therefor in its own right. And, that, Barium was unable to show. The court below, apparently realizing the situation, assumed to allocate to Barium credit for Manufacturing's payment of the deficiency taxes owing by Equipment but assessed against Manufacturing, the transferee of Equipment's assets. This, the court did by disregarding the separate corporate entities in the chain from Barium through Clyde to Manufacturing and by then treating the deficiency taxes paid by Manufacturing as an expense to Barium. The decisions in this State will be searched in vain for a single instance where a piercing of the corporate veil has been judicially sanctioned in order to confer a benefit upon the ones responsible for the presence of the veil. Certainly, the opinion for this court in the instant case cites no such decision.

The equitable doctrine of piercing the corporate veil was evolved and has been applied in order to prevent the perpetration of a wrong or injustice through the technical use of corporate forms. Thus, a corporation may not, for its own immunity, invoke a disregard of its separate entity or that of a subsidiary: *Homestead Borough v. Defense Plant Corporation*, 356 Pa. 500, 52 A. 2d 581; see, also, *Commonwealth v. Gulf Oil Corporation*, 359 Pa. 583, 60 A. 2d 46, where escape from liability for taxes by the device of piercing the corporate veil was judicially thwarted. Instances under Pennsylvania law where the courts have looked behind the corporate form have been such as to enable creditors to seize a corporate debtor's assets otherwise

beyond their reach (see, e.g., *McCarthy v. Ference*, 358 Pa. 485, 58 A. 2d 49), or where minority shareholders' interests could best be adequately and efficiently protected thereby (see *Hirshhorn v. Mine Safety Appliances Company*, 54 F. Supp. 588 D.C.W.D. Pa.), or where the corporate veil has been used in an attempt to cover or conceal an unlawful act (see *Tucker v. Binenstock*, 310 Pa. 254, 165 A. 247), or where evasion of statutory law has thus been prevented (see *Armour Transportation Company v. Pennsylvania Public Utility Commission*, 154 Pa. Superior Ct. 21, 34 A. 2d 821).

*Waring v. WDAS Broadcasting Station, Inc.*, 327 Pa. 433, 194 A. 631, which the opinion for the court cites in apparent opposition to the view herein expressed, was not even a case of piercing the corporate veil. It is but an illustration of the rule that when a corporation is the mere alter ego of a person, the corporate form may be disregarded,—a recognized exception to the general rule that a corporation and the stockholders who compose it are separate entities: *Homestead Borough v. Defense Plant Corporation*, supra. The case of *Commonwealth v. VanBuskirk*, 155 Pa. Superior Ct. 613, 631, 39 A. 2d 311, also cited in the opinion for the court, was a case of a conviction on an indictment charging embezzlement and did not involve the piercing of the corporate veil to confer a legal right which did not otherwise exist. *Tucker v. Binenstock*, cit. supra, likewise cited in the opinion for the court, was, as we have already seen, an instance where the corporate forms of two companies were disregarded because the veil had been used in an attempt to cover or conceal an unlawful act. The remaining cases cited in the opinion for the court are equally inapposite.

Barium is plainly without a right of action against the Wileys for taxes paid by Manufacturing

on account of Equipment Company's liability. The judgment for Barium should, therefore, be reversed and be here entered for the defendants on Barium's claim, while Glen Wiley's claim for salary should be allowed as the jury found it and as this court now accredits it.

It so happens that the members of this court who heard the argument of these appeals are evenly divided on the question of the legal propriety of piercing the corporate veil in the circumstances disclosed by the record. A judgment of affirmance is therefore indicated as a matter of course; and, since a right of action in Barium is thus accorded, I approve the reduction which the court makes in the judgment under review. But, my own further thought is that, in computing the defendants' liability on account of Equipment Company's tax deficiencies, the reserves and accruals for taxes to be reckoned with should be $28,908-.72, the actual amount thereof as of the closing date, July 31, 1946, instead of $17,021.51, the amount of the reserves and accruals for taxes as shown by the balance sheet of December 31, 1945. There is no need to make a fetish of the non-current balance sheet when the parties did not intend it to be conclusive. The contract of July 3, 1946, expressly provided,—"That the representations and warranties contained [therein] shall in all material respects be true and correct as of the closing date . . ." which the contract fixed as July 31, 1946. Barium then knew as well as, if not better than, the Wileys the probable extent of Equipment Company's liability for taxes. For upwards of four months immediately prior to the execution of the contract of July 3, 1946, Barium had had its auditors, examiners and accountants in the Wiley Equipment Company's offices and plant with full and unrestricted access to the Equipment Company's records and books of account.

Consequently, on the theory of liability approved by this court, the judgment in favor of Barium should be further reduced by $5,443.60, being one-half of the additional reserves for taxes on July 31, 1946, over the $17,021.51 shown by the 1945 balance sheet.

Mr. Justice ALLEN M. STEARNE and Mr. Justice CHIDSEY join in this dissenting opinion.