OPINION
COWEN, Circuit Judge.
Appellants Conestoga Wood Specialties Corporation (“Conestoga”), Norman Hahn, Elizabeth Hahn, Norman Lemar Hahn, Anthony Hahn, and Kevin Hahn (collectively, “the Hahns”) appeal from an order of the District Court denying their motion for a preliminary injunction. In their Complaint, Appellants allege that regulations promulgated by the Department of Health and Human Services (“HHS”), which require group health plans and health insurance issuers to provide coverage for contraceptives, violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb (“RFRA”) and the Free Exercise Clause of the First Amendment of the United States Constitution.[1] The District Court denied a preliminary injunction, concluding that Appellants were unlikely to succeed on the merits of their claims. See Conestoga Wood Specialties Corp. v. Sebelius, 917 F.Supp.2d 394 (E.D.Pa.2013). Appellants then filed an expedited motion for *381 a stay pending appeal with this Court, which was denied. See Conestoga Wood Specialties Corp. v. Sec’y of the United States Dep’t of Health & Human Servs., No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013). Now, we consider the fully briefed appeal from the District Court’s denial of a preliminary injunction.
Before we can even reach the merits of the First Amendment and RFRA claims, we must consider a threshold issue: whether a for-profit, secular corporation is able to engage in religious exercise under the Free Exercise Clause of the First Amendment and the RFRA. As we conclude that for-profit, secular corporations cannot engage in religious exercise, we will affirm the order of the District Court.
I.
In 2010, Congress passed the Patient Protection and Affordable Care Act, Pub.L. No. 111-148 (March 23, 2010) (“ACA”). The ACA requires' employers with fifty or more employees to provide their employees with a minimum level of health insurance. The ACA requires nonexempt group plans to provide coverage without cost-sharing for preventative care and screening for women in accordance with guidelines created by the Health Resources and Services Administration (“HRSA”), a subagency of HHS. See 42 U.S.C. § 300gg-13(a)(4).
The HRSA delegated the creation of guidelines on this issue to the Institute of Medicine (“IOM”). The IOM recommended that the HRSA adopt guidelines that require non-exempt group plans to cover “[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity.”[2] These recommended guidelines were approved by the HRSA. On February 15, 2012, HHS, the Department of the Treasury, and the Department of Labor published final rules memorializing the guidelines. See 77 Fed.Reg. 8725 (Feb. 15, 2012).[3] Under the regulations, group health plans and health insurance issuers are required to provide coverage consistent-with the HRSA guidelines in plan years beginning on or after August 1, 2012, unless the employer or the plan is exempt.[4] Appellants refer to this requirement as the “Mandate,” and we use this term throughout this opinion. Employers who fail to comply with the Mandate face a penalty of $100 per day per offending employee. See 26 U.S-.C. § 4980D. The Department of Labor and plan participants may also bring a suit against an employer that fails to comply with the Mandate. See 29 U.S.C. § 1132.
II.
The Hahns own 100 percent of the voting shares of .Conestoga. Conestoga is a Pennsylvania for-profit corporation that manufactures wood cabinets and has 950 employees. The Hahns practice the Mennonite religion. According to their Amended Complaint, the Mennonite Church “teaches that taking of life which *382 includes anything that terminates a fertilized embryo is intrinsic evil and a sin against God to which they are held accountable.” .(Am. Compl. ¶ 30.)[5] Specifically, the Hahns object to two drugs that must be provided by group health plans under the Mandate that “may cause the demise of an already conceived but not yet attached human embryo.” (Id. at ¶ 45.) These are “emergency contraception” drugs such as Plan B (the “morning after pill”) and ella (the “week after pill”). The Amended Complaint alleges that it is immoral and sinful for Appellants to intentionally participate in, pay for, facilitate, or otherwise support these drugs. (Id. at ¶ 32.) Conestoga has been subject to the Mandate as of January 1, 2013, when its group health plan came up for renewal. As a panel of this Court previously denied an injunction pending appeal, Conestoga is currently subject to the Mandate, and in fact, Appellants’ counsel represented during oral argument that Conestoga is currently complying with the Mandate.
III.
We review a district court’s denial of a preliminary injunction for abuse of discretion, but review the underlying factual findings for clear error and questions of law de novo. Am. Express Travel Related Servs. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir.2012). The District Court had jurisdiction over this case under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).
“A party seeking a preliminary injunction must show: (1) a likelihood of success oil the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.” Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir.2004). A plaintiff seeking an injunction must meet all four criteria, as “[a] plaintiff’s failure to establish any element in its favor renders a preliminary injunction inappropriate.” NutraSweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir.1999). This is the same standard applied in the District Court, and, on appeal, no party has questioned its accuracy.[6] We will first consider whether Appellants are likely to succeed on the merits of their claim, beginning with the claims asserted by Conestoga, a for-profit, secular corporation.
IV.
A.
First, we turn to Conestoga’s claims under the First Amendment. Under the First Amendment, “Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof.” The threshold question for this *383 Court is whether Conestoga, a for-profit, secular corporation, can exercise religion. In essence, Appellants offer two theories under which we could conclude that Conestoga can exercise religion: (a) directly, under the Supreme Court’s recent decision in Citizens United, and (b) indirectly, under the “passed through” method that has been articulated by the Court of Appeals for the Ninth Circuit. We will discuss each theory in turn.
In Citizens United, the Supreme Court held that “the Government may not suppress political speech on the basis of the speaker’s corporate identity,” and it accordingly struck down statutory restrictions on corporate independent expenditure. Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 365, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Citizens United recognizes the application of the- First Amendment to corporations generally without distinguishing between the Free Exercise Clause and the Free Speech Clause, both which are contained within the First Amendment. Accordingly, whether Citizens United is applicable to the Free Exercise Clause is a question of first impression. See Hobby Lobby Stores, Inc. v. Sebelius, — U.S.-, 133 S.Ct. 641, 643, 184 L.Ed.2d 448 (2012) (Sotomayor, Circuit Justice) (“This court has not previously addressed similar RFRA or free exercise claims brought by closely held for-profit corporations and their controlling shareholders.... ”).
While “a corporation is ‘an artificial being, invisible, intangible, and existing only in contemplation of law,’ ... a wide variety of constitutional rights may be asserted by corporations.” Consol. Edison Co. of N.Y., Inc. v. Pataki 292 F.3d 338, 347 (2d Cir.2002) (quoting Dartmouth Coll. v. Woodward, 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629 (1819) (Marshall, C.J.)) In analyzing whether constitutional guarantees apply to corporations, the Supreme Court has held that certain guarantees are held by corporations and that certain guarantees are “purely personal” because “the ‘historic function’ of the particular guarantee has been limited to the protection of individuals.” First Nat’l Bank of Boston v. Bellotti, 435 U.S. 765, 778 n. 14, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (internal citation omitted). The Bellotti Court observed:
Corporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as the privilege against compulsory self-incrimination, Wilson v. United States, 221 U.S. 361, 382-386, 31 S.Ct. 538, 545-546, 55 L.Ed. 771 (1911), or equality with individuals in the enjoyment of a right to privacy, California Bankers Assn. v. Shultz, 416 U.S. 21, 65-67, 94 S.Ct. 1494, 1519-1520, 39 L.Ed.2d 812 (1974); United States v. Morton Salt Co., 338 U.S. 632, 651-652, 70 S.Ct. 357, 368-369, 94 L.Ed. 401 (1950), but this is not because the States are free to define the rights of their creatures without constitutional limit. Otherwise, corporations could be denied the protection of all constitutional guarantees, including due process and the equal protection of the laws. Certain “purely personal” guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the “historic function” of the particular guarantee has been limited to the protection of individuals. United States v. White, 322 U.S. 694, 698-701, 64 S.Ct. 1248, 1251-1252, 88 L.Ed. 1542 (1944). Whether or not a particular guarantee is “purely personal” or - is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision.
Id. Thus, we must consider whether the Free Exercise Clause has historically pro *384 tected corporations, or whether the “guarantee is ‘purely personal’ or is unavailable to corporations” based on the “nature, history, and purpose of [this] particular constitutional provision.” Id.
In Citizens United, the Supreme Court pointed out that it has “recognized that First Amendment protection extends to corporations.” Citizens United, 558 U.S. at 342, 130 S.Ct. 876. It then cited to more than twenty cases, from as early as the 1950’s, including landmark cases such as New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in which the Court recognized that First Amendment free speech rights apply to corporations. See id. The Citizens 'United Court particularly relied on Bellotti, which struck down a state-law prohibition on corporate independent expenditures related to referenda issues. Bellotti held:
We thus find no support in the First or Fourteenth Amendment, or in the decisions of this Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because , its source is a' corporation that cannot prove, to the satisfaction of a court, a material effect on its business or property. [That proposition] amounts to an impermissible legislative prohibition of speech based on the identity of the interests that spokesmen may represent in public debate over controversial issues and a requirement that the speaker have a sufficiently great interest in the subject to justify communication.
Bellotti, 435 U.S. at 784, 98 S.Ct. 1407. Discussing Bellotti’s rationale, Citizens United stated that the case “rested on the principle that the Government lacks the power to ban corporations from speaking.” Citizens United, 558 U.S. at 347, 130 S.Ct. 876; see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm’n of Cal., 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (“The identity of the speaker is not decisive in determining whether speech is protected” as “Corporations and other associations, like individuals, contribute to the ‘discussion, debate, and the dissemination of information and ideas’ that the First Amendment seeks to foster.”) (quoting Bellotti, 435 U.S. at 795, 98 S.Ct. 1407).
Citizens United is thus grounded in the notion that the Court has a long history of protecting corporations’ rights to free speech. Citizens United overruled Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), a case in which the Court had “uph[eld] a direct restriction on the independent expenditure of funds for political speech for the first time in [this Court’s] history.” Citizens United, 558 U.S. at 347, 130 S.Ct. 876 (quoting Austin, 494 U.S. at 695, 110 S.Ct. 1391 (Kennedy, J., dissenting)). The Citizens United Court found that it was “confronted with conflicting lines of precedent: a pre-Austin line that forbids restrictions on political speech based on the speaker’s corporate identify and a post-Austin line that permits them.” Id. at 348, 130 S.Ct. 876. Faced with this conflict, the Court decided that Austin was wrongly decided, based on the otherwise consistent line of cases in which corporations were found to have free speech rights.
We must consider the history of the Free Exercise Clause and determine whether there is a similar history of courts providing free exercise protection to corporations. We conclude that there is not. In fact, we are not aware of any case preceding the commencement of litigation about the Mandate, in which a for-profit, secular corporation was itself found to have free exercise rights.[7] Such a total *385 absence of caselaw takes on even greater significance when compared to the extensive list of Supreme Court cases addressing the free speech rights of corporations.
After all, as the Supreme Court observed in Schempp, the purpose of the Free Exercise Clause “is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority.” Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (emphasis added). And as the District Court aptly noted in its opinion, “[rjeligious belief takes shape within the minds and hearts of individuals, and. its protection is one of the more uniquely ‘human’ rights provided by the Constitution.” Conestoga, 917 F.Supp.2d at 408. We do not.see how a for-profit “artificial being, invisible, intangible, and existing only in contemplation of law,” Consol. Edison Co., 292 F.3d at 346 (quoting Dartmouth Coll., 17 U.S. at 636 (Marshall, C.J.)), that was created to make money could exercise such an inherently “human” right.
We are unable to determine that the “nature, history, and purpose” of the Free Exercise Clause supports the conclusion that for-profit, secular corporations are protected under this particular constitutional provision. See Bellotti, 435 U.S. at 778 n. 14, 98 S.Ct. 1407. Even if we were to disregard the lack of historical recognition of the right, .we simply cannot understand how a for-profit, secular corporation— apart from its owners — can exercise religion. As another court considering a challenge to the Mandate noted:
General business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion. They do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.
Hobby Lobby Stores, Inc. v. Sebelius, 870 F.Supp.2d 1278, 1291 (W.D.Okla.2012), rev’d en banc, No. 12-6294, 723 F.3d 1114, 2013 WL 3216103 (10th Cir. June 27, 2013); see also Hobby Lobby Stores, Inc., 723 F.3d at 1174-75, 2013 WL 3216103, at *51 (Briscoe, C.J., concurring in part and dissenting in part) (questioning “whether a corporation can ‘believe’ at all, see Citizens United, 130 S.Ct. at 972 (‘It might also be added that corporations have no consciences, no beliefs, no feelings, no thoughts, no desires.’) (Stevens, J., concurring in part and dissenting in part).”).
In urging us to hold that for-profit, secular corporations can exercise religion, Appellants, as well as the dissent, cite to cases in which courts have ruled in favor of free exercise claims advanced by religious organizations. See, e.g., Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S, 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006); Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124. L.Ed.2d 472 (1993). None of the cases relied on by the dissent involve secular, for-profit corporations. We will not draw the conclusion that, just because courts have recognized the free exercise rights of churches and other religious entities, it necessarily follows that for-profit, secular corporations can exercise religion. As the Supreme Court recently noted, “the text of the First Amendment ... gives special solicitude to the rights of religious organizations.” Hosanna-Tabor Evangelical Lutheran *386 Church & Sch. v. EEOC, — U.S. -, 132 S.Ct. 694, 706, 181 L.Ed.2d 650 (2012). That churches — as means by which individuals practice religion — have long enjoyed the protections of the Free Exercise Clause is not determinative of the question of whether for-profit, secular corporations should be granted these same protections.
Appellants also argue that Citizens United is applicable to the Free Exercise Clause because “the authors of the First Amendment only separated the Free Exercise Clause and the Free Speech Clause by a semi-colon, thus showing the continuation of intent between the two.” (Appellants’ Br. at 34.) We are not persuaded that the use of a semi-colon means that each clause of the First Amendment must be interpreted jointly.
In fact, historically, each clause has been interpreted separately. Accordingly, the courts have developed different tests in an effort to apply these clauses. For example, while the various clauses of the First Amendment have been incorporated and made applicable to the states by the Due Process Clause of the Fourteenth Amendment, the Supreme Court did so at different times. Incorporation of the clauses of the First Amendment began with Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), where the Court noted that “we may and do assume that freedom of speech and of the press — which are protected by the First Amendment from abridgment by Congress — are among the fundamental rights and ‘liberties’ protected by the due process clause of the Fourteenth Amendment from impairment by the States.” More than ten years later, in De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937), the Court incorporated the right of peaceable assembly. In doing so, the Court cited to Git-low, and noted that “[t]he right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental.” Id. at 364, 57 S.Ct. 255. The language is important — even though the Free Speech Clause and the Petition Clause appear next to one another in the First Amendment, the Court did not find that Gitlow had already decided that the Petition Clause was incorporated, but rather cited Gitlow as precedent to expand the incorporation doctrine to cover the Petition Clause.
Several years later, in Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court incorporated the Free Exercise Clause. The Cantwell Court did not cite to Gitlow as authority for incorporating the Free Exercise Clause; in other words, it did not automatically follow that the Free Exercise Clause was incorporated just because the Free Speech Clause was incorporated. Seven years after Cantwell, in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court incorporated the Establishment Clause. In Everson, the Court cited to Cantwell and noted that the Court’s interpretation of the Free Exercise Clause should be applied to the Establishment Clause. Id. at 15, 67 S.Ct. 504. But notably, it took seven years for the Court to hold this; and following the same pattern, Cantwell did not automatically incorporate the Establishment Clause. Thus, it does not automatically follow that all clauses of the First Amendment must be interpreted identically.
Second, Appellants argue that Conestoga can exercise religion under a “passed through” theory, which was first developed by the Court of Appeals for the Ninth Circuit in EEOC v. Townley Engineering & Manufacturing Company, 859 F.2d 610 (9th Cir.1988), and affirmed in Stormans, Inc. v. Selecky, 586 F.3d 1109 (9th Cir. 2009). In Townley and Stormans, the Ninth Circuit held that for-profit corpora *387 tions can assert the free exercise claims of their owners.
In Townley, the plaintiff was a closely-held manufacturing company whose owners made a “covenant with God requiring] them to share the Gospel with all of their employees.” Townley, 859 F.2d at 620. Townley, the plaintiff corporation, sought an exemption, on free exercise grounds, from a provision of Title VII of the Civil Rights Act that required it to accommodate employees asserting religious objections to attending the company’s mandatory devotional services. Although the plaintiff urged the “court to hold that it is entitled to invoke the Free Exercise Clause on its own behalf,” the Ninth Circuit deemed it “unnecessary to address the abstract issue whether a for profit' corporation has rights under the Free Exercise Clause independent of those of its shareholders and officers.” Id. at 619-20. Rather, the court concluded that, “Townley is merely the instrument through and by which Mr. and Mrs. Townley express their religious beliefs.” Id. at 619. As “Townley presents no rights of its own different from or greater than its owners’ rights,” the Ninth Circuit held that “the rights at issue are those of Jaké and Helen Townley.” Id. at 620. The court then examined the rights at issue as those of the corporation’s owners, ultimately concluding that Title VU’s requirement of religious accommodation did not violate the Townleys’ free exercise rights. Id. at 621.
The Ninth Circuit subsequently applied Townley’s reasoning in Stormans. There, a pharmacy brought a Free Exercise Clause challenge to a state regulation requiring it to dispense Plan B, an emergency contraceptive drug. Stormans, 586 F.3d at 1117. In analyzing whether the pharmacy had standing to assert the free exercise rights of its owners, the court emphasized that the pharmacy was a “fourth-generation, family-owned business whose shareholders and directors are made up entirely of members of the Stormans family.” Id. at 1120. As in Townley, it “deeline[d] to decide whether a for-profit corporation can assert its own rights under the Free Exercise Clause and instead examine[d] the rights at issue as those of the corporate owners.” Id. at 1119. The court concluded that the pharmacy was “an extension of the beliefs of members of the Stormans family, and that the beliefs of the Stormans family are the beliefs of the phármacy.” Id. at 1120. Because the pharmacy did “not present ány free exercise rights of its own different from or greater than its owners’ rights,” the Ninth Circuit held, as it had in Townley, that the company had “standing to assert the free exercise rights of its owners.” Id.
Appellants argue that Conestoga is permitted to assert the free exercise claims of the Hahns, its owners, under the Toimley/Stormans “passed through” theory. After carefully considering the Ninth Circuit’s reasoning, we are not persuaded. We decline to adopt the Townley/Stormans theory, as we believe that it rests on erroneous assumptions regarding the very nature of the corporate form. In fact, the Ninth Circuit did not mention certain basic legal principles governing the status of a corporation and its relationship with the individuals who create and own the entity. It is a fundamental principle that “incorporation’s basic purpose is to create a distinct legal entity, with legal rights, obli: gations, powers, and privileges different from those of the natural individuals who created” the corporation. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). The “passed through” doctrine fails to acknowledge that, by incorporating their business, the Hahns themselves created a distinct legal entity that has legally *388 distinct rights and responsibilities from the Hahns, as the owners of the corporation. See Barium Steel Corp. v. Wiley, 379 Pa. 38, 108 A.2d 336, 341 (1954) (“It is well established [under Pennsylvania law] that a corporation is a distinct and separate entity, irrespective of the persons who own all its stock.”). The corporate form offers several advantages “not the least of which was limitation of liability,” but in return, the shareholder must give up some prerogatives, “including that of direct legal action to redress an injury to him as primary stockholder in the business.” Kush v. Am. States Ins. Co., 853 F.2d 1380, 1384 (7th Cir.1988). Thus, under Pennsylvania law—where Conestoga is incorporated— “[e]ven when a corporation is owned by one person or family, the corporate form shields the individual members of the corporation from personal liability.” Kellytown Co. v. Williams, 284 Pa.Super. 613, 426 A.2d 663, 668 (1981).
Since Conestoga is distinct from the Hahns, the Mandate does not actually require the Hahns to do anything. All responsibility for complying with the Mandate falls on Conestoga. Conestoga “is a closely-held, family-owned firm, and [we] suspect there is a natural inclination for the owners of such companies to elide the distinction between themselves and the companies they own.” Grote v. Sebelius, 708 F.3d 850, 857 (7th Cir.2013) (Rovner, J., dissenting). But, it is Conestoga that must provide the funds to comply with the Mandate—not the Hahns. We recognize that, as the sole shareholders of Conestoga, ultimately the corporation’s profits will flow to the Hahns. But, “[t]he owners of an LLC or corporation, even a closely-held one, have an obligation to respect the corporate form, on pain of losing the benefits of that form should they fail to do so.” Id. at 858 (Rovner, J., dissenting). “The fact that one person owns all of the stock does not make him and the corporation one and the same person, nor does he thereby become the owner of all the property of the corporation.” Wiley, 108 A.2d at 341. The Hahn family chose to incorporate and conduct business through Conestoga, thereby obtaining both the advantages and disadvantages of the corporate form. We simply cannot ignore the distinction between Conestoga and the Hahns. We hold—contrary to Townley and Stormans—that the free exercise claims of a company’s owners cannot “pass through” to the corporation.
B.
Next, we consider Conestoga’s RFRA claim. Under the RFRA, “[g]overnment shall not substantially burden a person’s exercise of religion even if the burden results from a rule of general applicability [unless the burden] (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. §§ 2000bb-l(a)-(b). As with the inquiry under the Free Exercise Clause, our preliminary inquiry is whether a for-profit, secular corporation can assert a claim under the RFRA. Under the plain language of the statute, the RFRA only applies -to a “person’s exercise of religion.” Id. at § 2000bb-l(a).
Our conclusion that a for-profit, secular corporation cannot assert a claim under the Free Exercise Clause necessitates the conclusion that a for-profit, secular corporation cannot engage in the exercise of religion. Since Conestoga cannot exercise religion, it cannot assert a RFRA claim. We thus need not decide whether such a corporation is a “person” under the RFRA.
V.
Finally, we consider whether the Hahns, as the owners of Conestoga, have viable Free Exercise Clause and RFRA claims on their own. For the same rea *389 sons that we concluded that the Hahns’ claims cannot “pass through” Conestoga, we hold that the Hahns do not have viable claims. The Mandate does not impose any requirements on the Hahns. Rather, compliance is placed squarely on Conestoga. If Conestoga fails to comply with the Mandate, the penalties — including fines, see 26 U.S.C. § 4980D, and civil enforcement, see 29 U.S.C. § 1132 — would be brought against Conestoga, not the Hahns. As the Hahns have decided to utilize the corporate form, they cannot “move freely between corporate and individual status to gain the advantages and avoid the disadvantages of the respective forms.” Potthoff v. Morin, 245 F.3d 710, 717 (8th Cir.2001) (quoting Kush, 853 F.2d at 1384). Thus, we conclude that the Hahns are not likely to succeed on their free exercise and RFRA claims.
VI.
As Appellants have failed to show that they are likely to succeed on the merits of their Free Exercise Clause and RFRA claims, we need not decide whether Appellants have shown that they will suffer irreparable harm, that granting preliminary relief will not result in even greater harm to the Government, and that the public interest favors the relief of a preliminary injunction. See NutraSweet Co., 176 F.3d at 153 (“A plaintiffs failure to establish any element in its favor renders a preliminary injunction inappropriate.”). Therefore, we will affirm the District Court’s order denying Appellants’ motion for a preliminary injunction.
We recognize the fundamental importance of the free exercise of religion. As Congress stated, in passing the RFRA and restoring the compelling interest test to laws that substantially burden religion, “the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution.” 42 U.S.C. § 2000bb(a). Thus, our decision here is in no way intended to marginalize the Hahns’ commitment to the Mennonite faith. We accept that the Hahns sincerely believe that the termination of a fertilized embryo constitutes an “intrinsic evil and a sin against God to which they are held accountable,” (Compl. • ¶ 30), and that it would be a sin to pay for or contribute to the use of contraceptives which may have such a result. We simply conclude that the law has long recognized the distinction between the owners of a corporation and the corporation itself. A holding to the contrary — that a for-profit corporation can engage in religious exercise — would eviscerate the fundamental principié that a corporation is a legally distinct entity from its owners.

. The Complaint also alleges that the regulations violate the Establishment Clause, the Free Speech Clause, the Due Process Clause, and the Administrative Procedure Act. While the District Court’s opinion addressed some of these additional claims, Appellants have limited their appeal to whether the regulations violate the RFRA and the Free Exercise Clause.

. See Women's Preventive Services: Required Health Plan Coverage Guidelines, available at www.hrsa.gov/womensguidelines (last visited July 25, 2013).

. These regulations were updated on July 2, 2013. See 78 Fed.Reg. 39870 (July 2, 2013). The recent changes have no impact on this litigation.

.The exemptions encompass "grandfathered” plans, which are plans that were in existence on March 23, 2010, see 45 C.F.R. § 147.140 and "religious employers,” see 45 C.F.R. § 147.130(a)(l)(iv)(B). Additionally, the ACA requirement to provide employer sponsored health insurance to employees is entirely inapplicable to employers that have fewer than 50 employees. See 26 U.S.C. § 4980H(a), (c)(2)(A).

. In addition, on October 31, 2012, Conestoga’s Board of Directors adopted "The Hahn Family Statement on the Sanctity of Human Life,” which provides, amongst other things, that "The Hahn Family believes that human life begins at conception (at the point where an egg and sperm unite) and that it is a sacred gift from God and only God has the right to terminate human life. Therefore, it is against our moral conviction to be involved in the termination of human life through abortion, suicide, euthanasia, murder, or any other acts that involve the taking of human life." (Id. at ¶ 92.)

. The dissent has undertaken a scholarly survey of the proper standard for obtaining a preliminary injunction throughout the country. However, Appellants never took an appeal of the preliminary injunction standard applied by the District Court. (See Appellants’ Br. at 4-6 (statement of issues presented for review).) Moreover, the dissent acknowledges that it "may be true” that the plaintiff’s failure to satisfy any element in its favor renders a preliminary injunction inappropriate. (Dissenting Op. at 392-93.)

. We acknowledge that the Court of Appeals for the Tenth Circuit, in an eight judge en *385 banc panel, in six separate opinions, recently held that for-profit, secular corporations can assert RFRA and free exercise claims in some circumstances. See Hobby Lobby Stores, Inc. v. Sebelius, No. 12-6294, 723 F.3d 1114, 2013 WL 3216103 (10th Cir. June 27, 2013). We respectfully disagree with that Court’s analysis.