## Nell v. McCrea

*Weary, Hess & Humer,* for claimant.

*J. Boyd, Landis,* for defendant.

*William F. Martson,* for Galen B. and Jane L. Reed.

SHEELY, P. J., specially presiding, April 3, 1958.—
This interpleader proceeding arose out of the sale of a
drugstore with its stock and equipment by Richard T.
Nell to Galen B. Reed and Jane L. Reed by agreement
dated August 5, 1949. The agreed sale price was
$18,940 and the agreement provided that $5,000 of
the purchase price would be held by John McCrea, Esq.,
and placed on deposit in the Peoples National Bank
of Shippensburg in escrow for a period of 90 days,
the escrow agreement to stipulate that in the event
no claims or demands were made upon the purchasers
within 90 days from the date of the agreement the
fund would be released to the seller. If claims were
made upon the purchasers by reason of their purchase
of the business, the fund should be utilized to save
harmless the purchasers in the event they were forced
to pay any claims or demands for which the seller was
liable. The agreement also provided that the seller
would comply with the Bulk Sales Act of May 23, 1919,
P. L. 262.

At or before the signing of the agreement a "para-
graph X" was added to the margin thereof providing:
"It is understood and agreed that the inventory shall
be taken on the 6th of August, 1949, and that an
adjustment on the price will be made for each dollar
that the inventory is under $10,000."

Contending that no valid claims were made against
the purchasers within the 90-day period and that he
was entitled to the return of the $5,000 deposit, plain-
tiff, Nell, instituted an action in assumpsit against
John McCrea. McCrea then filed a petition for inter-
pleader alleging, inter alia, that the purchasers, Reeds,
had made a claim against the fund for a deficiency
under $10,000 alleged to exist in the inventory. As a
result of these proceedings this court, by Shughart,
P. J., granted the prayer of the petition and directed

that Galen B. Reed and Jane L. Reed be added to the record as parties plaintiff and that they file a complaint in the action.

As the result of a pretrial conference it was agreed by the parties:

1. That the rights of all parties to the action against all other parties to the action will be determined in this action.

2. That the following questions shall be determined:

A. What was to be included in the inventory which was to be taken as set forth in the agreement?

B. Whether the inventory was less than $10,000, and how much?

C. Whether Galen B. and Helen L. Reed, his wife, in the event they are entitled to recover anything, shall be entitled to recover from the escrow fund as such?

D. Whether John McCrea shall be entitled to counsel fees incurred as the result of this interpleader action, and also whether he is entitled to compensation as escrow agent out of funds in his hands.

3. It was further agreed that if the court determined that the Reeds are not entitled to recover from the escrow fund but that there is a deficiency in the inventory for which they are entitled to be reimbursed by Richard T. Nell, that counsel for Nell will pay to the Reeds such deficiency from the fund awarded to their client before making distribution to their client.

We think it is clear that the escrow agreement was intended to protect the purchasers against liability under the Bulk Sales Act in the event that claims were made against them by creditors of the seller. The agreement of August 5, 1949, provided that the seller would comply with all regulations and rules of the Bulk Sales Act. It then provided if no claims or demands were made against the purchasers within 90 days, the fund would be released to the seller, and that if claims were

made against the purchasers "by reason of their purchase of this business then it is understood and agreed that said fund would be utilized to save harmless the parties of the second part in the event they are forced to pay any claims or demands for which the party of the first part is liable." These provisions could not relate to claims between the parties themselves and must have referred to claims which would be made under the Bulk Sales Act. This is further indicated in the escrow agreement dated the same day between Nell and John McCrea wherein it was recited that "whereas Galen B. Reed and Jane L. Reed, his wife, requested security for compliance with the Bulk Sales Act." It follows that unless the Reeds were compelled to pay claims of creditors of Nells', Nell was entitled to the return of the escrow money and this right, except for the interpleader proceeding, could not be defeated by a claim of the Reeds against Nell arising out of the initial contract. This would answer question 2 (C) in the negative.

However, it was stipulated that if the Reeds were not entitled to recover from the escrow funds but that there was a deficiency, the amount of the deficiency would be paid from the fund. It is therefore necessary to consider the other questions noted in the stipulation.

When the Reeds assert a claim against Nell for a deficiency in the inventory under the initial contract, they are in the position of plaintiffs and Nell is in the position of defendant, and the burden of proof is upon the Reeds to establish their claim by the weight or the preponderance of the evidence: Slavin v. Slavin, 368 Pa. 559 (1951).

The additional plaintiffs' claim is based upon paragraph 10 of the agreement which was added thereto at the time of execution. This paragraph provided that the inventory should be taken on August 6, 1949, and

that an adjustment on the price would be made for each dollar that the inventory was under $10,000. The additional plaintiffs contend that the inventory was deficient by the amount of $3,243.15 and claim this amount from plaintiff. Plaintiff contends: (1) That the equipment and fixtures should have been included in the inventory, in which event there would have been no deficit; and (3) that the inventory submitted by the additional plaintiffs is not reliable and should not be made the basis of a claim against him. These contentions raise the questions included in the stipulation under paragraphs 2(A) and 2(B).

The agreement of August 5, 1949, provided for the sale by plaintiff of "all his right, title and interest in the Nell's Cut Rate Drug Store . . .", and provided that "the items included in said sale are as follows: All the stock, equipment and fixtures located and used in the said business; all the good will of said business; franchise for the use of Breyer's Ice Cream. All right, title, and interest in the newspaper agency. The parties of the first part will assign the following deposits made to the newspaper publishers as follows: . . . Total $1340."

The provision of the agreement for an inventory and an adjustment in price in the event of a deficiency under $10,000 was obviously an afterthought. It was inserted into the agreement at the time of execution because the additional plaintiffs raised a question as to the value of what they were purchasing, and wanted some assurance. There was some question raised at the hearing as to whether one or more of the parties had signed the agreement before this paragraph was added, but we regard that question as immaterial since all parties did agree to the insertion of paragraph X.

The sale price originally agreed upon was $20,000, plus $1,340 representing the deposits with the news-

papers. The breakdown on this price was $8,500 for the newspaper business, $10,000 for stock and $1,500 for equipment and fixtures. At that time Nell was renting the premises from John McCrea and his brother for $50 a month, but when they heard that the business was to be sold, the McCreas notified the Reeds that they were raising the rent to $200 per month. It was then agreed that to compensate for this increased rental the sale price should be reduced by $2,400 to $17,600 plus $1,340 for the newspaper deposits, or a total of $18,940. It was not indicated what item was being reduced to accomplish this result; the reduction was in the total sale price.

The word "inventory" may be applied to a great number of situations and the question of what was to be included in the inventory must depend upon the intention of the parties and cannot be determined by a mere definition of the word. For that reason, and because of the lack of specification in paragraph 10, the parol evidence rule does not apply. It is unfortunate that the agreement was not more specifically drawn and that it did not indicate what was to be included in the inventory and on what basis, and by whom, the inventory was to be taken. Had this been done the present controversy would have been avoided.

It is clear from the testimony that the value of the stock of goods was discussed during the negotiations between the parties although, perhaps, the word "inventory" was not used. Mr. Nell was asked what, if anything, was said about inventory during the negotiations between him and Mr. Reed. He answered: "Well, I don't recall anything at that particular moment. We talked about value of stock and all that and the *value of the stock is more than $10,000 as I have continually contended,* and they wanted to know if they were getting their money's worth, and I allowed them freedom to inspect the stock." According to Mr.

Nell the purpose of the inventory of the stock on the second floor, which was taken prior to the execution of the agreement, was to assure the Reeds that the value was there.

If the Reeds were concerned about whether they were getting their money's worth and therefore insisted upon "paragraph X" being added to the agreement before they signed, and if the original breakdown of the asking price included $10,000 for stock and $1,500 for fixtures, etc., and if Mr. Nell continually contended that the value of the stock was more than $10,000, it is reasonable to suppose that the "inventory" referred to in paragraph X was to be an inventory of the stock only. This is supported by the testimony of Kenneth Hall, who was the sales agent for Mr. Nell, that: "When we talked about what the stock would amount to he (Nell) said he had stated that he knew there was a certain amount there and he would guarantee a certain amount."

We conclude that the word "inventory" as used in paragraph X was to be an inventory of stock and that Mr. Nell thereby guaranteed that the stock inventory would total $10,000.

Plaintiff argues that this conclusion means that he agreed to take nothing for his fixtures and that this was unlikely because of the original breakdown of the sale price for the business. It is noted that the original breakdown allowed nothing for the Breyer's Ice Cream franchise which was described in the testimony as being valuable, and that when plaintiff agreed to reduce the sale price by $2,400 to compensate for increased rental, the reduction had to come from one of the items, either the newspaper franchise which had cost plaintiff $8,000 and was included at $8,500, or the stock of goods included at $10,000, and which plaintiff insisted was worth more than that amount, or from the fixtures and one or both of the other items. In any case

plaintiff was to receive less than full value for some item.

Having concluded that paragraph X was a guarantee by plaintiff that the stock of goods would inventory at $10,000, we come to the more difficult problem of whether the inventory was less than $10,000, and how much. The answer to that depends upon the answer to two other problems: At what prices was the inventory to be taken, and was the inventory submitted by the additional plaintiff a fair and accurate inventory. The agreement was silent as to the prices at which the inventory was to be taken.

The additional plaintiffs contend that the inventory was to be taken at retail prices, that is, at the prices marked on the items, or on the shelves, or given to them by Mr. Nell, and then reduced by 30 percent to arrive at the wholesale value which was the value contemplated in the $10,000 guarantee. Plaintiff admits that the inventory was to be taken at retail prices but denies that there was any agreement as to how these prices were to be reduced although he agrees that it was to be reduced to wholesale prices. That the inventory was to be taken at retail prices is established by the testimony. That is how it was taken on the night that plaintiff assisted the additional plaintiffs in taking the inventory on the second floor, and admittedly the additional plaintiffs frequently asked prices of plaintiff during the following week. The important question is how much, if any, the retail prices were to be reduced.

According to Galen Reed plaintiff informed him a week before the sales agreement was signed that he worked his income tax by taking the inventory at retail and reducing it by 30 percent to arrive at a wholesale figure. He also testified that at about the time the agreement was signed plaintiff said they would take the inventory at retail and reduce it by 30 percent, and that while the inventory was being taken he re-

peated this formula. This testimony was substantiated by Wallace Leach. On the other hand plaintiff emphatically denied that there was "any agreement as to discount or anything like that." It was his idea that they would have to get back to wholesale prices and that possibly they would have to get the advice of a disinterested person or use the original invoices. The method of reducing the retail price inventory was not discussed until after the additional plaintiffs insisted upon the insertion of paragraph X in the contract. According to the additional plaintiff, at that time everyone was in a big hurry to ge the matter concluded and apparently the parties were not specific in their discussions.

Plaintiff admits that the retail inventory was to be reduced in some manner. According to his testimony, when the additional plaintiffs raised the question of a deficiency he insisted that the inventory be completed and corrected before there was any discussion about a percentage reduction. At that time, he testified, Mr. Reed tried different percentages, 30 percent, 25 percent, and 20 percent. This, of course, occurred after the question of deficiency arose and the suggestion of other percentages may have been made in an effort to work out a settlement of the problem, but if it had been previously determined that the retail inventory was the additional plaintiffs who insisted upon para-stand why a figure of 20 percent or other percentages should be discussed or why the 30 percent figure should not have been mentioned in the agreement. While the agreement was originally prepared for plaintiff, it was the additional plaintiffs who insisted upon paragraph X being added and it was they who said what the paragraph should include. The circumstances support plaintiff's contention that there was no agreement as to the method by which the retail inventory should be reduced.

Mr. Nell testified that the average markup in the store was 30 percent. If this be true, the wholesale price could not be computed by taking 30 percent off from the retail price as this would produce a figure less than the actual wholesale price. And if it be true that the average markup was 30 percent and that this was discussed between the parties during the negotiations, it might furnish the basis on which the additional plaintiffs conceived that the retail price was to be reduced by 30 percent to obtain the wholesale price.

At the time the additional plaintiffs purchased the store Mr. Reed had no experience in that business and knew nothing about it, although his wife had had some experience. Unfortunately the parties never got together and agreed how the inventory should be taken and they did not cooperate in taking the inventory. They worked together one night prior to the execution of the agreement and, according to plaintiff, they were to work together the following evening but the additional plaintiffs did not show up. According to the additional plaintiffs they worked together on Sunday night before the agreement was signed but this is denied by plaintiff and he accounted for where he and his wife were on that evening. The agreement provided that the inventory should be taken on Saturday, August 6th, but nothing was done on that day, perhaps because the agreement was not actually signed and the purchase price paid until Monday, August 8th. Thereafter, the additional plaintiffs proceeded to take the inventory themselves and, while they asked prices of plaintiff from time to time, there is no evidence that they invited plaintiff to participate in taking the inventory. Plaintiff left on an extended trip before the inventory was completed. Apparently both parties were to blame for the failure to cooperate in taking the inventory as plaintiff testified he made no effort

to take the inventory because the Reeds did not show up on Thursday night as agreed orally or on Saturday night as provided by the contract.

The taking of the inventory was a difficult task as it was done while the store was being operated. This meant that some stock was being taken from the stockroom and placed on the shelves before it was inventoried and some after it was inventoried. Some stock was being sold from the shelves before it was inventoried and some after it was inventoried. Purchases of new stock were being made, some of which were placed on the shelves and some in the stockroom. The additional plaintiffs attempted to account for these various conditions. After the stockroom was inventoried a list of articles taken therefrom and placed on the shelves was attempted to be kept. An effort was made to keep the proceeds of the sale of inventoried articles separate from the proceeds of sale of uninventoried articles. A record was kept of new purchases which were placed on the shelves. All of this presented a difficult task for persons with no experience in the business and in a business selling small articles that would appear in a cut rate drugstore.

Plaintiff has attacked the inventory submitted by the additional plaintiffs both on the ground that articles which were in the store were not included in the inventory and on the ground that the prices listed for many articles were not the correct retail prices. The additional plaintiffs admitted some of these errors. In this connection it is recalled that the prices were taken from the tags on the articles or the prices marked on the shelves, or by consulting plaintiff when these markings did not appear. But plaintiff went on a trip before the inventory was completed and there is nothing to show where the additional plaintiffs secured prices for unmarked articles thereafter.

Keeping in mind that the burden of proof is upon

the additional plaintiffs to establish their claim, and considering the uncertainty of the method by which the retail prices were to be reduced to obtain the wholesale prices and the uncertainty as to the correctness of the inventory submitted by the additional plaintiffs in the light of the attacks made upon it, we find that the additional plaintiffs have failed to sustain that burden. . . .

We come now to the question of whether John McCrea is entitled to counsel fees incurred as the result of the interpleader proceedings and whether he is entitled to compensation as escrow agent out of funds in his hands.

The Act of May 21, 1943, P. L. 471, 12 PS §583, provides that whenever any person having in his possession money which is claimed by two or more persons shall come into court and disclaim all interest in the funds, procure an interpleader between the rival claimants to determine the true ownership of the funds and pay said funds into court, or as the court may direct, the court shall allow the stakeholder out of the funds paid into court, its costs and such reasonable counsel fees as the court may determine to be proper, to be taxed as costs of the proceedings. In this case the court made no order for the disposition of the fund pending the litigation so we may assume that the court intended the money to remain in the custody of the escrow agent and that its failure to order otherwise is the equivalent of a direction to the effect, and that the fund is now technically under the control of the court.

The general rule is that an escrow agent is in effect the agent of both parties claiming the fund, and should be disinterested in the controversy: Kreuer v. Union National Bank, 276 Pa. 201 (1923) ; Paul v. Kennedy, 376 Pa. 312 (1954). The Act of 1943, supra, refers to the person instituting interpleader proceedings to

whom an allowance for counsel fees may be made as a "stakeholder." This term was considered in Metropolitan Life Insurance Company v. Doty, 140 Pa. Superior Ct. 581 (1940), as having been broadened "to mean a person who holds money or property which is claimed by rival claimants, but in which he himself has no interest." See also Penn Mutual Life Insurance Company v. Gaston, 89 D. & C. 306 (1954).

In this case it is clear that John McCrea departed from the role of being the agent of both parties and from being disinterested in the controversy. When the controversy arose concerning the alleged deficiency in the inventory he consented to become counsel for the Reeds. According to him this was with the consent of counsel for Nell and was for the purpose of trying to reach an adjustment of the problem. This may have overcome the ethical problem, but it did not change his status as escrow agent or the obligations flowing from that status. If his services as counsel for the Reeds involved no more than trying to reach an adjustment of the controversy, no problem would arise. But when an adjustment was not reached, Mr. McCrea, as counsel for the Reeds, caused a fraudulent debtors' attachment to issue against Nell and sought to attach the escrow fund in his own hands. This was after he, as escrow agent, had refused to pay over to Nell the escrow fund at the expiration of the 90-day period because of the claim which the Reeds had allegedly made against the fund. Mr. McCrea himself testified for the Reeds by depositions in the hearing in that action. The present action of assumpsit was thereafter brought by Mr. Nell against Mr. McCrea and McCrea then asked for the interpleader.

In his opinion accompanying the order for interpleader Judge Shughart, after discussing the other claims alleged to have been asserted against the escrow fund, said: "It is apparent from the foregoing that

the principal objection on the part of Mr. McCrea and the Reeds to turning over the deposit arises out of the alleged deficiency in the inventory. . . . Counsel for Mr. Nell opposed the grant of the interpleader on the ground that Mr. McCrea has from the beginning been counsel for the Reeds and, therefore, the adverse claim of the Reeds against him is of his own creation or, to state it another way, the Reeds' claim against the fund in Mr. McCrea's hands is predicated on the legal advice which McCrea gave to them. There can be no doubt that Mr. McCrea would have been in a far better position had he ceased to represent the Reeds when the controversy arose between the parties over the inventory. There also can be no doubt that he feels that the Reeds are entitled to their claim against the fund arising out of the alleged shortage in the inventory. It is likewise clear that the relationship between Mr. McCrea and the Reeds is such that he would have their full cooperation in defending this action of assumpsit against Nell." We agree fully with these statements.

As we have shown previously in this opinion, the escrow fund was created solely for the purpose of protecting the purchasers from liability under the Bulk Sales Act and had no reference whatever to possible disputes between the parties concerning the inventory. No claims were presented to or paid by the purchasers under the Bulk Sales Act and Mr. Nell was entitled to the return of his deposit after the 90 day period. When Mr. McCrea, acting in the dual capacity of escrow agent and counsel for the Reeds, refused to pay the deposit at that time and subsequently sought to attach it for the claim of his clients, he ceased to be a disinterested party or a mere stakeholder faced with conflicting claims and seeking to protect himself. His interest then was to retain the fund as security for the payment of any claim which he might establish on behalf of his clients. Under these

circumstances he cannot be allowed costs and counsel fees under the Act of May 21, 1943, P. L. 471, 12 PS §583.

Mr. McCrea also claims an allowance of fees as escrow agent. The escrow agreement made no provision for payment of fees to him as agent but, entirely aside from this, the same considerations which prevent him from claiming fees under the interpleader proceedings prevent him from claiming fees as escrow agent.

Both parties claim interest on the amounts due them. Interest is compensation allowed by law for the use or detention of money: Barium Steel Corporation v. Wiley, 379 Pa. 38, 52 (1954). But here the money has not been used or detained by any of the parties. The order of this court allowing the interpleader, while it did not specifically direct that the fund should continue to be held by John McCrea, impliedly so directed, perhaps because the agreement provided for the deposit of the fund in the Peoples National Bank of Shippensburg. After the court allowed the interpleader the fund was under the control of the court just as effectively as though it had been paid into court, and where money is paid into court, or at the direction of the court, liability for interest ceases: Seaboard Construction Company v. Curtis, 54 D. & C. 1, 5 (1945). The order to be entered in interpleader proceedings is an order disposing of the money which has been paid or delivered by defendant in compliance with an order made by the court: Pa. R. C. P. 2315. The order must deal specifically with the fund and does not take the form of a money judgment against the unsuccessful claimants (Hollander v. Friedman, 360 Pa. 20, 24 (1948)), and therefore cannot include interest . . .

### Order

And now, April 3, 1958, it is ordered and decreed that John McCrea, as escrow agent, shall pay from

the escrow funds in his possession the sum of $100, and any interest which might have been earned thereon, to Galen B. Reed and Jane L. Reed, and the sum of $4,900, together with any interest which might have been earned thereon, to Richard T. Nell. The cost of this proceeding to be paid by Galen B. Reed and Jane L. Reed.

It is further ordered that the prothonotary shall enter this order as an order nisi and give notice thereof to the parties or their attorneys of record, and if no exceptions are filed thereto within 10 days, the said order shall be entered as a final order.